**Mary LENIHAN, Plaintiff,**

**v.**

**The CITY OF NEW YORK; Edward Koch as Mayor of the City of New York; Police Department of the City of New York; Benjamin Ward as Police Commissioner of the City of New York and as Chair of the Board of Trustees Police Pension Fund; Members of the Board of Trustees of said fund; Article II Medical Board, Robert McGuire, as former Police Commissioner, Defendants.**

**No. 84 Civ. 4571 (WCC).**

United States District Court, S.D. New York.

December 16, 1985.

On Motion For Reconsideration
Jan. 15, 1986.

See also, D.C., —— F.Supp. ——.

Janice Goodman, New York City, for plaintiff; Janice Goodman, Jill Sheinberg, of counsel.

Frederick A.O. Schwarz, Corp. Counsel of the City of New York, New York City, for defendants; Marilyn Richter, Charlotte Biblow, Sharon Hyman, Asst. Corp. Counsel, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiff Mary Lenihan ("Lenihan"), a policewoman currently employed by the Police Department of the City of New York ("the Department"), commenced this action in June 1984 seeking to enjoin the Department and the Board of Trustees of the Police Pension Fund from retiring her from service on psychiatric grounds. Among the other named defendants are the City of New York ("the City"), Mayor Edward Koch, the Police Commissioner, and an entity known as the Article II Psychiatric Medical Board, which evaluated Lenihan and recommended to the Board of Trustees

that she be retired or, in police parlance, "surveyed."

In her complaint, Lenihan asserts that in referring her for psychological evaluation and in making the subsequent determination to retire her, the various defendants discriminated against her on the basis of her sex, retaliated against her for her participation in a class action by which female police officers gained substantial retroactive seniority and related benefits, and violated her due process rights by refusing to afford her an adversary hearing. Plaintiff seeks injunctive relief, compensatory damages, and attorneys' fees pursuant to title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1982), the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1982), and § 296 of the New York Human Rights Law, N.Y.Exec.Law § 296 (McKinney 1982).

In conjunction with the filing of her complaint, plaintiff moved by order to show cause for a preliminary injunction. After a half-day of testimony on the preliminary injunction issue, the Court proposed and defendants agreed that they would take no further steps to retire Lenihan pending a full trial on the merits. The matter was ultimately tried before the Court sitting without a jury and on January 21, 1985, after ten days of testimony, the Court entered a preliminary injunction restraining defendants from retiring Lenihan on psychiatric grounds pending a final ruling on the merits.

The parties agreed to submit posttrial memoranda, which were filed in due course. The Court has now carefully reviewed these memoranda, together with the testimony and the documentary evidence received at trial, and this Opinion and Order incorporates the Court's findings of fact and conclusions of law pursuant to rule 52(a), Fed.R.Civ.P. For the reasons set forth below, I conclude that defendants discriminated against Lenihan on the basis of her sex, and violated her due process rights. Accordingly, judgment will be entered in favor of plaintiff, enjoining the Department from retiring her on

psychiatric grounds solely on the basis of the record it has amassed to date and awarding her reasonable attorneys' fees and damages in the amount of $2,500.

*Background*

Mary Lenihan passed a Civil Service examination for the position of New York City police officer in 1965, but because the City was not hiring female police officers at the time, no action was taken on her application. For the next several years she worked as a clerk stenographer for the United States Postal Service and, in 1969, she obtained employment as a correction officer with the New York City Department of Correction. The performance evaluations she received as a probationary correction officer were most unflattering; fourteen of her fifteen supervisors rated her work below average, and her file contains, among other things, the description of an incident in which she allegedly failed to come to the aid of another officer in distress. Lenihan took issue with the fairness and accuracy of the evaluations she received at the Department of Correction, but resigned her position nonetheless and, in 1970, returned to the Postal Service.

In 1973, eight years after Lenihan passed the police examination, the Police Department evaluated her qualifications to be a police officer. It conducted an extensive investigation into her personal, financial, scholastic, and employment background, and compiled its findings in a document referred to as a "P.A.15," which, pursuant to Department policy, was not available for her inspection. After reviewing Lenihan's application, the Department's Candidate Review Board recommended that her appointment be approved; however, the Personnel Director for the City of New York marked her "Not Qualified" on the basis of her prior employment record. Plaintiff thereafter requested and was granted a hearing before the City Civil Service Commission, which explored the allegations levelled against her by the Department of Correction and ultimately granted her appeal, marking her "Qualified" for the position of policewoman. Exh. 28. She was

subsequently appointed to the force as a probationary officer and, in February 1974, she was assigned to the Police Academy.

In February and May 1974, as part of the ordinary recruit psychological evaluation program, Lenihan and each of her classmates underwent psychological testing and an interview with the staff of the Department's Psychological Services Unit. According to the director of that unit, Lenihan's tests and interview yielded "no psychiatric or cognitive disturbances which would contraindicate [her employment as a police officer]." Exh. 29.

Lenihan received the first evaluation of her performance at the Police Academy on July 11, 1974. Exh. 22. The report indicates that Lenihan met standards overall. She was characterized as shy and unassuming, but her rater opined that she would improve while in field training. She was criticized for failing to participate more in class discussions and to become involved with others, but was rated "above standards" in her willingness "to serve the public in all aspects of police work." Her rater commented that she displayed self-confidence, that she was not easily distressed or upset, and that she appeared able to make sound judgments. Lenihan was recommended for transfer to a field assignment, and on July 22, 1974, she was assigned to the 104th Precinct.

Lenihan's performance at the 104th Precinct was evaluated for the first time in a report dated October 26, 1974. Exh. 22 at 3–4. Her sergeant indicated that, overall, she met standards. Although he indicated that she should be more aggressive and should get more involved in group discussions, he expressed the view that familiarity, time, and patrol experience would improve her judgment and decisionmaking. He described her as "even tempered" and indicated that she had positive and professional attitudes toward police work and ethics. Her captain reviewed the sergeant's evaluation and added the following comments: "Ratee has performed well. Has good productivity and shows willingness to perform."

In a subsequent evaluation of her work at the 104th Precinct, Lenihan's rater indicated that Lenihan was a willing worker and took reasonable risks, that her written reports were "complete and accurate," and that her arrest and summons activity was "above average." Exh. 22 at 5–6. There were some less favorable comments as well; specifically, her rater commented that she had had trouble controlling her emotions in a time of stress, and that she required more experience to grasp patrol techniques. With respect to her decision-making abilities, he indicated that she had not been observed outside the presence of field training officers, and that her critical decisions therefore had been made by others. Overall, her performance was again found to meet standards. In February 1975, Lenihan passed her probationary period.

Later that year, Lenihan was laid off as a result of the City's fiscal crisis. Thereafter, she became an active member of the plaintiff class in *Acha v. Beame*, 401 F.Supp. 816 (S.D.N.Y.), in which 80 policewomen sued the Department, charging that their layoffs constituted unlawful discrimination. After a hearing, the court-appointed special master determined that but for unlawful discrimination against Lenihan, she would have been hired by the Department on November 7, 1966. The class action was ultimately settled and, as a result of that settlement, plaintiff was reinstated with retroactive seniority. According to uncontroverted testimony adduced at trial, the retroactive seniority awarded these women caused considerable resentment among the male officers, some of whom lost precedence in the selection of vacation time and other benefits as a result of being displaced on seniority lists. One witness stated: "The general feeling of most … police officers was they thought it was bullshit. … They just felt it wasn't fair … [that the women] got seniority for not being in the Police Department, not serving their time." Tr. at 383–84.

Upon her reinstatement in March 1977, Lenihan underwent a second psychological

evaluation. She was found fit and was assigned to the 78th Precinct. According to plaintiff, this was where her troubles began.

In an evaluation completed on November 5, 1977, a Sergeant Curry rated her overall performance as "below standards." Exh. 23. He indicated that her major weakness lay "in a lack of self confidence that [was] communicated to others," and he noted that although this had not caused any major problems, a few minor incidents had resulted. He stated further:

> On some occasions Officer Lenihan has not been able to handle situations while performing matron duties. This may again be a result of a lack of self confidence. There is no problem regarding the excessive use of force although at times a show of force may have prevented certain incidents from developing.

*Id.* This evaluation was reviewed by Captain Richard C. Schauffert, who commented that he did not believe Lenihan possessed the assertiveness and self-assurance necessary to perform effectively as a police officer. He indicated that she would be assigned to a Field Training Officer to develop her skills. *Id.* Lenihan testified at trial that she had contested the accuracy of the remarks contained in this evaluation, but that Schauffert had suggested there would be some sort of retribution if she appealed her evaluation or took other formal steps to protest. Schauffert denied ever having threatened to take measures against her if she appealed.

On November 11, 1977, only days after she had received the unfavorable evaluations from Sergeant Curry and Captain Schauffert, Lenihan suffered a back injury while on matron duty; apparently she was forcibly pushed against a wall while searching a female prisoner. On the recommendation of Dr. Leonard Fox, a "district surgeon" employed by the Department,[1] she remained on sick leave for two weeks and then returned to the station on restricted duty for another two weeks. Thereafter she went back on full duty, but continued to experience pain in her back when she walked for any length of time.

In July 1978 Lenihan was still complaining of back pain. She consulted Dr. Fox, who wrote a memorandum to Captain Schauffert requesting that Lenihan be assigned to radio motor patrol instead of foot patrol to alleviate her symptoms. Several days later, Schauffert responded that all radio cars in his command were filled, and that in any event, Lenihan was unable to find another officer who was willing to ride with her on a steady basis.[2] Schauffert also suggested in his memorandum to Dr. Fox that Lenihan be assigned to restricted duty for the duration of her disability if she could not perform full duty. Approximately one week later, Lenihan was placed on restricted duty and was transferred to the Pistol License Application Division, out of Captain Schauffert's command.

A month or so later, in late August 1978, Dr. Fox sent a memorandum to Psychological Services requesting that Lenihan be given a psychological evaluation to assess her "ability emotionally to handle police duty." Exh. 25. According to the memorandum, Captain Schauffert had expressed concern about her suitability as a police officer and had indicated that her small size might have affected her self-confidence. Whether Schauffert suggested or mentioned a psychological evaluation to Dr. Fox remains unclear, but the memorandum indicates that Dr. Fox then discussed the matter with Deputy Inspector Hall, a nonmedical uniformed officer responsible for the administrative aspects of the Department's Health Services. Fox and Hall agreed that an evaluation would be in order. Dr. Fox testified at trial that he never

---

1. The Health Services Division of the Police Department is divided into medical districts, and it is each district surgeon's responsibility to supervise the medical needs of officers who reside within his or her district. Tr. at 887–88, 917.

2. Lenihan denied ever having been offered an opportunity to work on motor patrol, and testified that she had neither sought nor been rejected by a potential partner.

discussed the problem with a medical supervisor at Health Services "because Schauffert felt this was more in line with administrative and police decision making than medical decision making." Tr. at 939. Psychological Services did not respond immediately to Dr. Fox's referral.

During the next several months, Lenihan remained in the Pistol License Application Division. A performance evaluation dated October 15, 1978 indicates that she met standards overall, and that she was "apparently stable and adaptable." Exh. 21.

In late October 1978, Lenihan became embroiled in a dispute regarding vacation days she had accrued while assigned to the 78th Precinct. She had been denied a request for vacation time, and had filed a grievance charging that she was entitled to the time under the terms of the *Acha v. Beame* settlement. Lenihan ultimately prevailed. She went on vacation and when she returned she found a note on her desk directing her to report to Psychological Services. No further explanation was provided.

Lenihan appeared at Psychological Services at the appointed date and time, and was interviewed for approximately one hour by Dr. Martin Symonds, a psychiatrist, and Michael McInerny, a uniformed officer assigned to the unit. Prior to the examination, Dr. Symonds had reviewed Lenihan's medical folder and her P.A.15, but at no time before or after the examination did he review her performance evaluations. Dr. Symonds issued a short memorandum report on March 15, 1979, Exh. 18, in which he began by commenting that Lenihan looked retarded, wore her hair short, and appeared "neuter." He went on to evaluate her intelligence as normal, but indicated that she was "defensive, evasive and on guard." He concluded, based primarily on his brief interview and the description in the P.A.15 of her Department of Correction experience ten years earlier, that she suffered from a "non psychotic, severe schizoid personality with oppositional traits." Dr. Symonds characterized her job performance as marginal at best, and

stated that her personality disorder made her a problem police officer. He continued:

> She is totally without acknowledged insight into her limited ability to handle stress and it is my considered opinion she is psychologically unsuitable to perform full police duty. Though she may have fine assets, they are not sufficient to compensate or reduce her limited and rigid responses to stress. Her psychological limitations are ... sufficient enough to interfere with ordinary performance of full police duty. I recommend administrative survey.

*Id.*

In a subsequent memorandum dated April 3, 1979, Exh. B, Dr. Symonds directed that Lenihan's firearms be removed. He stated that although he did not consider her dangerous or impulsive, there was a likelihood that if faced with an armed confrontation, she might allow her firearms to be taken away from her. He stated that "her passivity and oppositional traits could make her a severe liability under ordinary stress." *Id.* Lenihan's firearms were then removed, but no immediate steps were taken to retire her pursuant to Dr. Symonds' earlier recommendation.

Meanwhile, plaintiff remained in the Pistol License Application Division, performing satisfactorily. However, she continued to bring herself to the attention of administrative and medical personnel. On April 12, 1979, she filed a grievance with the Department's Office of Equal Opportunity, charging that Captain Schauffert had discriminated against her in evaluating her performance, in refusing to assign her to motor patrol, in denying vacation time due her under the *Acha v. Beame* settlement, and finally, in requesting that she be sent for evaluation by Psychological Services. Exh. 32. After an investigation, the Office of Equal Opportunity determined that Schauffert had not instigated the referral to Psychological Services; it therefore concluded that there was no probable cause to believe discrimination had occurred. Exh. 34. The following month, after Lenihan's orthopedist had recommended that she

swim twice weekly in a warm pool for therapy, Lenihan requested that she be given permission to use the Police Academy swimming pool or, in the alternative, that the Department pay for a health club membership for her. This request was referred to the Department's Chief Surgeon, who apparently failed to respond. In August, she filed another grievance challenging her placement on the Department's chronic sick list. Exh. 31. She acknowledged that she had been absent from work, but argued that the chronic sick designation was unfair because her absenteeism might have been avoided had the Department been responsive to her requests for assignment to motor patrol, and for permission to use the Police Academy pool. This appeal was approved, and she was removed from the chronic sick list.

On February 26, 1981, at the request of the Police Commissioner, an Article II Psychiatric Medical Board was convened for the purposes of determining whether Lenihan could perform full police duty, and making an appropriate recommendation to the Board of Trustees of the Pension Fund.[3] The Board consisted of a presiding psychiatrist, Dr. Philip Kaminstein, and two other medical doctors. Lenihan attended this hearing accompanied by her attorney but, consistent with Department policy, the attorney was not permitted to accompany her inside the hearing room. She requested and was granted a month's adjournment in order to obtain unspecified documentation. Lenihan had not had an opportunity to review her own medical file prior to the hearing, as it was and continues to be the policy of the Department to refuse access to officers under review by the Article II Psychiatric Board. The Department does allow attorneys to review medical files, however, and Lenihan ultimately received a copy of Dr. Symonds's report through her attorney.

The Article II Psychiatric Board met again on March 26, 1981. At that time, Lenihan submitted a letter from her attorney explaining why she believed that she had been discriminated against, and why there was no basis for retiring her on psychological grounds. The Article II Board nonetheless concluded, apparently on the basis of Dr. Symonds' report, that she was a "definite schizoid personality." It deferred final action, and recommended a complete battery of psychological tests and an orthopedic consultation. Exh. O.

In accordance with the recommendation of the Psychiatric Board, Lenihan was tested and examined on March 3, 1982 and March 9, 1982, by Arthur Knour, Ph.D., a staff psychologist with the Department. After administering a variety of tests including a Rorschach, Dr. Knour made certain contemporaneous case notes. He wrote that "a cursory glance indicates that there are not sufficient indicators of pathology to warrant psych survey," and he added that if Lenihan was a problem police officer, she "should be handled administratively." Exh. 30. Dr. Knour reviewed his file again on September 16, 1982, and wrote "nothing obtained in test material suggesting P.O. cannot function on job from psychiatric perspective." He indicated further that after he had completed a formal write-up, the case could most likely be closed. *Id.*

Dr. Knour completed his formal report on November 23, 1982. He noted, first, that both Dr. Symonds and the Article II Board had concluded that Lenihan was a schizoid personality, and that both had raised questions about her intellectual functioning. Dr. Knour indicated that Lenihan was of average intelligence, but that her personality test had revealed a highly constricted individual with a repressive, de-

---

**3.** The Article II Psychiatric Medical Board makes a recommendation to the Board of Trustees of the Pension Fund as to whether a disability exists, and, if so, whether there is a line-of-duty injury. The Board of Trustees makes the final decision, but its authority is limited; it does not have the power to reject the underlying medical determinations of the Article II Board. The Board of Trustees does make the final determination as to causality, but its members "will usually adopt the medical board's determination as to disability if they find all their questions answered." Tr. at 861–62.

fensive style. He found that she emphasized concrete rather than abstract concepts, and that she appeared to have difficulty integrating various features in complex situations. Dr. Knour also noted that Lenihan's "somewhat atypical and idiosyncratic" responses led to the impression that she might be schizoid, but that "the test material *did not* provide any concrete evidence of a thought disorder or of serious distortions of reality." Exh. 19 (emphasis added). He observed that an unequivocal diagnosis was "hard to come by," and he disagreed with Dr. Symonds' diagnosis of a schizoid personality. Tr. at 576. He found, however, that Lenihan "might possibly be classified as a mixed personality disorder—specifically an inadequate personality with avoidant features." *Id.* Dr. Knour stated further:

> The question of Officer Mary Lenihan's ability to function adequately in the Police Department and thus whether she should remain ... or else survey should be recommended is also a difficult question to respond to unequivocally. Much depends on the nature of the demands placed upon her. ... The question of her past performance and evaluations might be more indicative of her ability to function as a full duty police officer. The only information available to this writer is suggestive of some difficulties in job performance.

Exh. 19.

Despite his own recognition that performance evaluations might provide a more reliable indication of Lenihan's abilities and limitations than his own equivocal test results, Dr. Knour did not review those evaluations. He found, instead, that Lenihan's test results, combined with her employment record at the Department of Correction, suggested that "a survey might be in the best interest of the Police Department." *Id.* He submitted his report to Dr. Symonds, who endorsed the recommendation for survey on November 30, 1982.

Lenihan's next appearance before the Article II Psychiatric Board was in April 1983. This Board was chaired by Dr. Gabriel Koz,

another psychiatrist. Again Lenihan complained of disabling back pain and again the Board deferred final action, recommending that Lenihan be examined by a neurologist and by the Article II Orthopedic Board. These examinations were conducted over the course of that year, and on December 12, 1983, the Orthopedic Board found no objective evidence of any disabling back condition. Lenihan's case was then referred back to the Psychiatric Board.

Lenihan submitted to the Psychiatric Board two reports from outside orthopedic specialists who disagreed with the findings of the Orthopedic Board. The Board did not formally acknowledge those reports, but recommended another evaluation by a Department neurologist, and deferred action again. The neurologist found "no positive neurological findings," and Lenihan was scheduled to appear before the Psychiatric Board a final time on March 15, 1984.

Lenihan's March appearance before the Board, which was again chaired by Dr. Koz, lasted approximately one-half hour. The Board reviewed her medical file, and asked Lenihan various questions about her back condition and her experience in the Department of Correction, among other matters. According to the Board's report of that hearing, Lenihan stated that she could not walk a beat because of the line-of-duty back injury she had sustained in 1977, and that she wanted to continue in her position with the Pistol License Application Division, or else be retired on three-quarters pay, which would reflect a work-related disability.

The Psychiatric Board's final report, Exh. T, is dated March 15, 1984. It contains a list of the documents the Board considered in making its determination; the list includes the referral of Dr. Fox, the reports of Drs. Symonds and Knour, and the reports of various orthopedic and neurological evaluators, but does not include those submitted by Lenihan. According to the testimony elicited by plaintiff at trial, a previous draft of Exhibit T included Lenihan's physicians' reports. A decision was

made by Dr. Koz and another Department physician to remove them from the final draft of the Board's report because these reports were "not helpful." Tr. at 133.

The report briefly reviews Lenihan's history of medical and psychological evaluations, and her employment experience in the Department of Correction. The Board indicated in its report that there was no evidence that Lenihan continued to suffer from a back injury, and it reiterated its earlier conclusion that "[t]here was a clear positive psychiatric diagnosis with sufficient grounds for psychiatric survey." The Board adopted Dr. Knour's diagnosis of inadequate personality with avoidant features, and his finding of an occupational problem. It therefore concluded that plaintiff was unfit for police duty, and recommended to the Board of Trustees of the Police Pension Fund that she be approved for ordinary disability retirement, which would entitle her to a pension equal to one-half of her pay at the time of retirement. On June 28, 1984, anticipating that the Board of Trustees would act on the recommendation, plaintiff filed this action.[4]

As indicated above, Lenihan raised three claims for relief. First, she alleged that defendants had discriminated against her on the basis of her sex. Specifically, she asserted that she had been referred to Psychological Services and recommended for psychiatric survey on evidence far less compelling than that present in the cases of male officers referred and evaluated. Second, plaintiff alleged that her referral to Psychological Services was instigated by Captain Schauffert and others in retaliation for her grievance against Schauffert, her participation in *Acha v. Beame*, and her insistence that she be provided the benefits awarded under the settlement agreement in that action. Finally, she contended that she had been denied due process insofar as the Department had not afforded her an adversary hearing, or an opportunity to review all of the documents relied upon by

the Psychiatric Board in considering whether to recommend her retirement.

At trial, Lenihan presented evidence in support of each of these claims. She attacked the reliability of the evaluations performed by Drs. Symonds, Knour, and Koz, and she presented her own expert, Dr. Naomi Goldstein, who testified that in her opinion, Lenihan displayed considerable self-confidence and displayed "no evidence [of a] personality disorder." Tr. at 1272. Most significantly, plaintiff produced the medical files of eight male police officers who, according to defendants, were situated similarly to Lenihan. With these records, plaintiff attempted to show that even assuming she suffered some personality disorder, the Department had dealt with her far more harshly than it had dealt with males whose behavior was much more bizarre and dangerous than hers.

Plaintiff also presented evidence designed to demonstrate that Captain Schauffert was notoriously prejudiced against female officers, and had expressed the view on more than one occasion that policewomen were incapable of performing adequately. She elicited the fact that charges of sexual discrimination had been filed by other policewomen under Schauffert's command, and that at least one of the allegations contained in those grievances was verified by the Office of Equal Opportunity. Moreover, she demonstrated that there were many disgruntled male officers who believed that the retroactive seniority achieved by policewomen under *Acha v. Beame* was unfair. Having thus established evidence of this atmosphere of prejudice and resentment, she asked the Court to conclude, based on the fact that her record with the Department was satisfactory until she came under Schauffert's supervision, that he bore animus toward her because of her vocal opposition to discrimination in his precinct, and that he was responsible for her unwarranted referral to Psychological Services.

---

4. On December 15, 1984, shortly before the full trial of this matter began, the Board of Trustees voted to retire Lenihan on psychiatric grounds. That order was stayed.

Finally, Lenihan elicited evidence of the policies and procedures employed by the Department in evaluating officers for psychiatric fitness. She established, for example, that officers under review by the Article II Psychiatric Board are not permitted to review their medical files, that attorneys are not permitted to attend Board hearings with officers being evaluated, that no cross-examination of Department psychiatrists is permitted, that officers may not present live witnesses before the Board, and that no investigation into the reliability of reports submitted by Department doctors is undertaken by Board members. These procedures, according to plaintiff, fail to provide adequate due process protections.

Defendants, of course, contested each of these assertions. They attempted to show that Lenihan was "worthless" as an officer and had been a problem even before she was assigned to Schauffert's precinct; that Schauffert did not discriminate against the women in his command and that, in fact, each of the women in his precinct had been offered and had declined an opportunity to transfer to the precinct of her choice; that Schauffert had played no part in Lenihan's referral to Psychological Services and that, in fact, he did not even believe her behavior warranted psychological evaluation; that Lenihan was accorded the same treatment as male officers similarly situated; and that the Department's policies with respect to appearances before and evaluations by the Article II Psychiatric Board provided adequate due process safeguards.

As I indicated at the outset, I conclude that plaintiff has met her burden with respect to her claims that the Department retaliated and discriminated against her on the basis of sex, and that the procedures utilized in certifying her for psychiatric survey violated rudimentary due process requirements. The basis for my conclusions is set forth below.

*Discussion*

*I. Lenihan's Title VII Claim*

I note, at the outset, that to the extent plaintiff hopes for a ruling from this Court that she suffers no psychiatric disability, or that the Department should be permanently enjoined from retiring her because the diagnosis of the Article II Psychiatric Board was incorrect, she will be disappointed. For reasons which will soon become clear, I can endorse neither defendants' claim that plaintiff suffers from a disability, nor plaintiff's claim that she does not.

Cases such as this are particularly difficult for courts to resolve, and the reasons are not hard to discern. The most apparent is the fact that judges are necessarily reluctant to undertake a reconciliation of the disparate views that seem inevitably to arise when two or more psychiatrists attempt to analyze and predict the behavior of an individual with whom they have spent no more than an hour or two. As this case amply demonstrates, the courtroom is hardly an appropriate forum for a determination of whether the Rorschach Test, for example, is a reliable basis for predicting job performance. Moreover, the courts are in no position to determine how the New York City Police Department should deploy its personnel, or to distinguish those behavioral idiosyncrasies which are sufficiently maladaptive to render an officer unsuitable for duty from those which the Department should be expected to tolerate without cause for concern. For these reasons, any ruling by the Court that Lenihan should be placed on radio motor patrol, or should immediately have her firearms restored, would constitute a presumptuous and unwarranted intrusion into a highly technical and specialized administrative process of critical importance to the efficiency and even the safety of police operations.

This is not to say that the administrative processes of the Police Department are beyond the scrutiny of the courts, or that federal judges should quail when confronted with psychiatric or other scientific jargon. To the contrary, with due consideration for their respective spheres of expertise, judges can and must compel police officials to apply their policies evenhandedly, and require psychiatrists to state and

explain, in terms comprehensible to a layman, the factual bases underlying their conclusions. Only in this way can the federal courts hope to ensure that discrimination does not occur, while at the same time keeping within the limits of their own competence.

Unfortunately, as the instant cases demonstrates, this obligation can be more easily articulated than fulfilled. Even after a lengthy trial, this Court finds itself in no better position than it was at the outset to determine whether Mary Lenihan suffers from an "inadequate personality with avoidant features," and if so, how such traits affect her job performance. The Court does not have before it a single expert medical opinion that is based upon a thorough review of all relevant materials, or one that sets forth a reasoned analysis of all the relevant facts and psychiatric principles. As a result, plaintiff will have to be satisfied with a ruling that with respect to the Department's decision to "survey" her, she was treated differently than her male colleagues, and that this difference was attributable, at least in part, to her sex.

Before I turn to the merits of plaintiff's claims, I must set forth several legal principles that are critical to an understanding of the questions presented here. First, I note that although the parties have expended considerable effort in reviewing the distribution of burdens and the order of proof applied in title VII actions such as this, I find it unnecessary to perform a full analysis of these issues in light of the Supreme Court's ruling in *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

In *Aikens*, the Court observed that the *prima facie* case method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny was "never intended to be rigid, mechanized or ritualistic" but is "merely a sensible orderly way to evaluate the evidence ... as it bears on the critical question of discrimination." 460 U.S. at 715, 103 S.Ct. at 1482 (quoting *Furnco Constr. Co. v. Waters*, 438 U.S.

567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) ). The *Aikens* Court concluded that "[w]here the defendant had done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so [was] no longer relevant" because the trial court had before it all the evidence it needed in order to determine the ultimate factual issue of "whether the defendant intentionally discriminated against the plaintiff." *Id.*

Thus, under the *Aikens* doctrine, my focus here must be on the question of whether a preponderance of the evidence demonstrates that plaintiff was the victim of intentional discriminatory treatment, or, in other words, whether defendants' conduct evinced a discriminatory purpose. Before turning to the evidence, however, I must consider the meaning of the term "discriminatory purpose."

■ It is clear that the plaintiff seeking to prove a claim of sex discrimination need not demonstrate that her employer bears a conscious animus or malice toward women. Indeed, illegal discrimination often arises out of very subtle stereotyping that may reflect a benign or protectionist view of women and their place in society. For this reason, and also because employers have become sophisticated enough to shield true animus behind facially neutral documentation that will "cover" them if the need arises, the courts must be willing to read between the lines, and to recognize that circumstantial evidence may be the only evidence available to a title VII plaintiff. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977).

■ Also well-established is the principle that a plaintiff need not demonstrate that discrimination was the *only* motive behind the challenged practice. In order for a plaintiff to prove illegal discrimination, she need only show that her gender played a significant part in the adverse decision. In other words, she must show that "but for" her membership in the protected class, she

would not have been treated as she was. *See, e.g., McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 282 n.10, 96 S.Ct. 2574, 2579 n. 10, 49 L.Ed.2d 493 (1976).

■ The "but for" or "significant factor" analysis remedies what has recently been recognized by courts and commentators as a shortcoming of the *McDonnell Douglas* "pretext" analysis, under which courts sometimes felt compelled to determine which one of two proposed rationales reflected the "true reason" for the employer's conduct. The "but for" analysis recognizes that in many cases, the reason articulated by the employer is not entirely pretextual—that it may have played a part, even a substantial one, in the decisionmaking process, but that discriminatory motives also played a necessary part. *See, e.g., Lewis v. University of Pittsburgh,* 725 F.2d 910 (3d Cir.1983), *cert. denied,* — U.S. ——, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984); *EEOC v. Federal Reserve Bank,* 698 F.2d 633 (4th Cir.1983), *rev'd on procedural grounds sub nom. Cooper v. Federal Reserve Bank,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984); *Lincoln v. Board of Regents of the Univ. Sys. of Georgia,* 697 F.2d 928 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); *see generally* Brodin, *The Standard of Causation in the Mixed-Motive Title VII Action: A Social Policy Perspective,* 82 Colum. L.Rev. 292 (1982). These courts have differed to some extent in their articulations of the standard, but it is now clear that illegal discrimination has occurred if gender was a determinative factor in the decision.

■ Another related principle of particular importance to the instant case should be set forth explicitly. The essence of the right secured by title VII is that of equal treatment. Therefore, an employer may violate title VII even by discharging an employee pursuant to a legitimate policy, if it does not apply its policy evenhandedly. The Supreme Court established this principle in *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574,

49 L.Ed.2d 493 (1976), holding that the defendant had violated title VII by discharging two white employees, but not a black employee, all of whom had been caught stealing company property. The Court said: "While Santa Fe may decide that participation in a theft of cargo may render an employee unqualified for employment, this criterion must be 'applied alike to members of all races,' and Title VII is violated if, as petitioners allege, it was not." *Id.* at 283, 96 S.Ct. at 2580 (citation omitted).

■ Keeping these principles in mind, I examine now plaintiff's claim that the original decision to refer her to Psychological Services for evaluation, and the subsequent decision to retire her from the force as psychiatrically unsuited to full police duty, were manifestations of intentional discrimination on the basis of her sex.

First, I am convinced, on the basis of the evidence adduced at trial, that at the time Lenihan was referred for psychological evaluation, there existed in the Police Department an atmosphere of hostility toward those women who had received retroactive seniority and other benefits as a result of the settlement of *Acha v. Beame.* There was also a general sentiment among many officers, including Captain Schauffert, that women could not adequately perform as full-duty police officers. Although Schauffert denied making derogatory statements about the women in his command, I find quite credible plaintiff's testimony that he told her, "[F]emale police officers should not be out on patrol. They have no business being out on patrol, could not handle patrol work." Tr. at 270. Plaintiff's testimony is supported by the reports of other policewomen under Schauffert's command. Exh. 43.

It is clear that the relationship between Captain Schauffert and Officer Lenihan was not congenial. Having observed the demeanor of both individuals, and having credited Lenihan's testimony about Schauffert's blatantly sexist comments, it seems to me likely that Schauffert viewed her as a paradigm of the unsuitability of women

as police officers. She was relatively diminutive in stature, and she displayed an apparent deficiency of self-confidence. Moreover, I am satisfied that his feelings about female officers in general and Lenihan in particular were aggravated by his resentment of her repeated requests for what he perceived as special treatment. Further, the evidence has satisfied me that Captain Schauffert's resentment of Lenihan was translated into unfair treatment of her.

Even if I credit the testimony that it was Dr. Fox and not Captain Schauffert who actually initiated Lenihan's referral to Psychological Services, it is clear that Schauffert did communicate his evaluation of Lenihan's abilities to Fox, and that these sentiments influenced the decision to refer Lenihan for evaluation, even if they were disguised as concerns that her size may have affected her self-confidence. Tr. at 903. It is also apparent to me from the fact that Lenihan's evaluators repeatedly commented on her inability to function as an officer—even though they had never reviewed her performance evaluations—that Captain Schauffert's influence did not stop with Dr. Fox.

Plaintiff also succeeded in demonstrating to my satisfaction that the Department approached her case in a manner inconsistent with that generally employed in dealing with male officers. I do not wish to imply by this that the Department had any formal policies or guidelines with respect to the referral or evaluation processes—quite to the contrary, among the statements that cause me particular concern are Officer McInerny's statement that referrals to Psychological Services were sometimes used "to get to an officer," tr. at 366, and Dr. Fox's comment that plaintiff was viewed by Captain Schauffert and by him as an "administrative problem" rather than a medical problem. Tr. at 939. Nonetheless, Officer McInerny and Dr. Symonds did testify that as a general rule, officers were

not referred to Psychological Services unless they had exhibited bizarre or dangerous behavior. The types of conduct that had, in the past, brought officers to the attention of this unit included hallucinatory and delusional ravings, chronic alcoholism, involvement in off-duty shooting incidents, mistreatment of civilians, and threats of physical violence to family members. Moreover, the evidence showed that there were male officers who had engaged in these types of serious maladaptive behavior but who, inexplicably, had not been referred for evaluation. For example, Officer X, a male officer,[5] was not referred to Psychological Services even after an incident in which he shot at a liquor cabinet in a public bar while he was off duty.

None of the witnesses could recall any other police officer who had ever been referred solely because of a perceived deficiency of self-confidence. Lenihan, who was never accused of having engaged in any bizarre or dangerous behavior, stands in marked contrast to the other officers whose records the Court has reviewed.

With respect to the entire course of Lenihan's treatment by the Department, including the ultimate decision to recommend survey, I find support for plaintiff's claims in three areas: the reports of Drs. Symonds and Knour; the testimony of Dr. Koz, who chaired the Article II Board that recommended survey; and the files of the male officers recommended for survey. The last of these categories provides the most compelling evidence.

At trial, plaintiff introduced the medical files of eight male officers who, according to defendants, suffered disabilities comparable to hers. On the basis of this evidence, Lenihan has argued and I agree that, as a group, the male police officers were treated far more leniently than she was treated.

As plaintiff has pointed out, four of the male officers in the group themselves sought counselling, referral to Psychologi-

cal Services, or even psychiatric hospitalization. Apparently, none of them was referred to Psychological Services by their superiors or by their district surgeons, despite the fact that each had experienced serious problems. For example, each admitted to active homicidal or suicidal impulses, and two voluntarily surrendered their firearms for fear that they might kill family members. One admitted that he had developed a phobia of his job. Exhs. 49, 51, 52, 53. It is clear to me that these four male officers were not treated similarly to Lenihan in terms of the initial referral. The remaining four officers, only three of whom were ultimately recommended for survey, each displayed such deviant and bizarre behavior that it is difficult to imagine how they could possibly be viewed as situated similarly to plaintiff.

Officer 1 was referred to Psychological Services after a civilian filed a complaint charging him with harassment and molestation. He was diagnosed as having a personality disorder in 1970. The results of psychological testing revealed difficulty in establishing personal relationships and an "emphasis on repressive mechanisms." He was also characterized as someone who "tend[ed] to avoid situations involving strong emotional challenge" and whose "judgment appeared weak." Nonetheless, unlike plaintiff, he was restored to full duty, with his firearms. He was also transferred to a new precinct as a result of his inability to get along with his superiors. In 1979, after his wife complained that he had threatened her with his weapon, he was interviewed by Dr. Symonds, who found "no psychological contraindication." Apparently there were subsequent threats by Officer 1 to kill his wife, and although Officer 1 has appeared before the Article II Psychiatric Board, the Board has not yet recommended survey. Exh. 47.

Officer 2 was referred to Psychological Services in 1982 after his wife reported that he was ranting and raving. Dr. Symonds interviewed him, recommended counseling, and returned him to full duty with his firearms. Moreover, Dr. Symonds took no action when, only one month later,

he received notification that Officer 2 had again engaged in "highly inappropriate" behavior. In 1983, Officer 2 was referred to Psychological Services for depression. He was anxious and angry, and reported that voices told him to kill himself. He was then referred for weekly therapy, but survey was not recommended. Ultimately, Officer 2 deteriorated further. He became disoriented as to time, and functioned "only on the most minimal level"; his wife had to administer his medication to him. Only when he refused to consider the shock therapy recommended by his physician did the Article II Board recommend survey. Exh. 48.

Officer 4 was referred to Psychological Services because he was given to explosive outbursts and was constantly argumentative. There was a feeling among his fellow officers that he might pose a danger to them when angry, and that he had verbally abused members of the public. After a psychological evaluation, Dr. Symonds recommended that his attitudes and behavior be dealt with administratively, and that there be no psychiatric intervention. Dr. Symonds recommended that he be placed in a low-stress job with minimal public contact. Officer 4's problems continued, however, and he was ultimately diagnosed as having a personality disorder with paranoid features. His prognosis was described as "[p]oor *if unresponsive to assignment change.*" (emphasis added). Only after he refused to consider "any type of treatment or medication" was he recommended for survey. Exh. 50.

Officer 8, who had a history of violence and maladjustment even before joining the police force, was not referred to Psychological Services even after the Department received seven civilian reports about him, most alleging acts of violence. He was finally referred for evaluation after committing an assault on a civilian, and in 1973, after being diagnosed as having a personality disorder, he was placed on restricted duty and sent for therapy. He was returned to full duty with his firearms in 1975, and over the next eight years, contin-

ued to amass charges and civilian complaints. The Court will not detail all of the allegations contained in his extraordinary record; suffice it to say that this hefty file demonstrates long-standing and serious problems with excessive violence, dishonesty, and defiance of the law. Officer 8 was finally recommended for survey in 1983. Exh. 54.

In addition to the eight officers whose files were submitted by defendants, the Court has reviewed the file of Officer X. As noted above, Officer X was not referred for evaluation even after an incident in which he fired shots in a bar. Moreover, although he had a history of bizarre behavior, and was described in some of the same terms applied to plaintiff—"constricted," "defensive," "withdrawn," and "emotionally restricted"—he has been permitted to serve in the Pistol Licensing Division without firearms for more than four years. Apparently, the Department intends to retain him until his retirement on a full pension.

I am satisfied, based upon the evidence above, that to the extent the Department had any policy or practice at all with respect to referral to Psychological Services and subsequent recommendation of psychological survey, it was a policy of last resort. Moreover, I am satisfied that the Department's treatment of Lenihan represented a radical departure from that policy. Unlike the male officers, Lenihan was referred without any indication of bizarre behavior. Moreover, after her referral, she was not offered therapy or treatment of any kind, but was immediately recommended for survey. According to Dr. Symonds, this was because she lacked insight into her problems. However, the record reflects that male officers with a similarly diagnosed lack of insight, or even with severe delusions, were offered various kinds of therapy, including shock treatment.

Defendants, faced with this record, now attempt to suggest that no legitimate comparisons can be drawn between Lenihan and these male officers because the facts and circumstances of each case are "unique." They argue that these decisions "were clinical judgments rendered by professionals based on a variety of factors," and thus that this "is not a situation where simple conclusions can be drawn by a lay person." Defendants' Post-Trial Memorandum of Law at 56. While I readily agree that the facts and circumstances of each case differ, it by no means follows that meaningful comparisons cannot be drawn. I cannot accept defendants' suggestion that this is an issue which transcends the competence of a lay judge and I view that argument merely as an attempt to cloud an obvious disparity in treatment.

I am also unpersuaded by defendants' suggestion that a finding of discrimination on the basis of this evidence would mean that in the future, the Department would be unable to survey any member of a group protected by title VII so long as a single unprotected group member, similarly situated, remained on the force. According to defendants, a single "mistake" made with respect to a white male officer would forever bar the Department from finding women and minorities psychiatrically disabled from police duty.

This suggestion is ridiculous. In the first place, this record evidences not merely a single "mistake" but a persistent pattern of what is, to me, disturbingly lenient treatment of male officers with severe psychological problems. Second, title VII bars *intentional* discrimination, and so an occasional inadvertence or "mistake" would not support the finding of a violation. Finally, the records of these male officers are not being viewed in isolation. They are indeed compelling evidence, but they are not the only evidence that discrimination occurred here. The Court's conclusion that Lenihan was discriminated against is derived in part from these files, but it also is based on evidence of discriminatory animus in Lenihan's precinct and evidence gleaned from a careful review of the various expert opinions considered by the Article II Psychiatric Board. Thus, defendants' fear is entirely unfounded.

■ It is with great reluctance, and with full knowledge that perhaps I approach the limits of lay competence, that I embark now upon a discussion of discrimination on the part of Dr. Koz, the chairman of the Article II Psychiatric Board. It became apparent during Dr. Koz's testimony that his diagnosis of Lenihan's psychiatric problem was based, in large part, on the fact that plaintiff had repeatedly sought to exercise legitimate rights and privileges, some of which were secured by title VII, others by her employment contract, and still others by the settlement agreement in *Acha v. Beame*. Among the types of behavior cited by Dr. Koz as manifestations of Lenihan's personality disorder were: participating in the *Acha v. Beame* lawsuit and seeking retroactive seniority thereunder; filing a successful grievance to receive vacation time that was due her under the terms of the settlement; successfully challenging the Department's decision to place her on the chronic sick list; filing a complaint against Captain Schauffert; challenging the validity of statements about her participation in incidents at the Department of Correction; seeking retirement at three-quarters pay instead of one-half pay; requesting an adjournment of the first convened Article II Psychiatric Board so that she could obtain documentation; requesting permission to swim in the Police Academy pool; requesting an assignment to motor patrol to ease her back symptoms; and finally, instituting this lawsuit. All of these were examples of her "oppositional traits."

Dr. Koz insisted that regardless of whether these claims and demands were reasonable or unreasonable, they evidence a psychiatric condition when considered together. He was convinced that her repeated challenges to authority had and continues to have a psychiatric significance. This, in my view, is a dubious and even dangerous position.

Beyond question, there is a psychiatric significance to the fact that an individual habitually and relentlessly demands things to which he or she is not entitled. Even to a lay person, such behavior suggests an inability to cope with reality. It defies logic, however, to reach a similar conclusion in a situation where the individual's demands uniformly have merit. I therefore feel compelled to scrutinize closely the basis upon which Dr. Koz and the other members of his Article II Psychiatric Board determined that survey was appropriate.

I have searched the record for evidence that would support defendants' contention that the Article II Board chaired by Dr. Koz conducted a thorough and independent evaluation of plaintiff, and reached an informed and professional judgment with respect to her mental fitness. Unfortunately, I find such evidence wholly lacking, and although I do not doubt that Dr. Koz's evaluation of Lenihan may have been valid in certain respects, I am left with the impression that his diagnosis and recommendation were based in part on his clear understanding that the Department wanted her surveyed.

Dr. Koz insisted at trial that he based his conclusions on Lenihan's "whole history." In fact, he had conducted only a very brief interview with her and had not taken any family, personal, or social history. He was unaware of the fact that she had performed full police duty, and he had not reviewed her performance reports; therefore, he was unaware that she had received favorable evaluations. He was not aware that she had done well at the Police Academy, and he had never thought to question the validity of the psychiatric opinions expressed by others. He relied upon Dr. Symonds's evaluation of the P.A.15, mistakenly believing that the P.A.15 contained reports of Lenihan's performance as a police officer. He refused to acknowledge the possibility that her back pain was organically caused, and he made no attempt to reconcile his conclusion with the opinions of the orthopedists whose reports were submitted by Lenihan. These factors, combined with the undisputed fact that Lenihan had not manifested any of the types of behaviors common to most of the officers who were recommended for survey, lead

me inescapably to the conclusion that Dr. Koz was not an unbiased evaluator. He was well aware that the Department considered Lenihan a troublemaker, and he was apparently ready to endorse the Department's judgment that she was not good police material. I conclude that his diagnosis of "oppositional traits" and his resulting recommendation of a psychiatric survey were infected by the antagonistic attitude discussed above.

Dr. Knour and Dr. Symonds appear to have fallen victim to the same syndrome of undue deference to the obvious desires of the Department. It is not necessary to discuss here all of the purported shortcomings of the evaluations performed by these two individuals, which plaintiff has pointed out in exhaustive detail. I limit myself to a few critical points.[6]

Stressing that neither Dr. Symonds nor Dr. Knour ever reviewed her performance evaluations, plaintiff has repeatedly criticized Dr. Symonds's statement that her performance was marginal, and Dr. Knour's comment that she experienced difficulty in job performance. I made clear during the course of the trial, and I reiterate here with all due respect to these doctors, my view that this criticism is valid in that the evaluations surely constituted the best evidence of her ability to function. I recognize that what I perceive to be a lapse in professional judgment in no way signals discriminatory intent; however, this deficiency is significant insofar as it may have allowed or facilitated effectuation of the discriminatory animus of others.

Having reviewed the evidence and observed the witnesses, I conclude that both Dr. Knour and Dr. Symonds unhesitatingly accepted Captain Schauffert's view of Lenihan's ability to function as a police officer—a view affected in some significant measure by her sex—and that to the extent they incorporated this view into their recommendations for survey, they also served

as instruments of discrimination. I believe that both doctors were given to believe from the outset that Lenihan was unwelcome on the force, and that each rendered an opinion that accommodated that view.

Dr. Symonds recommended plaintiff for survey after an hour-long interview which was prompted by no particular episode of inappropriate behavior. This factor, when viewed in light of his apparent reluctance to recommend survey for far more disturbed male officers, is especially persuasive. Two additional examples of undue deference to the Department's objectives come to mind. First, Dr. Knour conceded in his report that the results of his psychological testing dictated no clear course of action, and that Lenihan's performance evaluations might prove "more indicative of her ability to function as a full duty officer." Exh. 19. Nonetheless, he concluded, without requesting an opportunity to review these evaluations, that a psychiatric survey would "be in the best interest of the Police Department." *Id.* Moreover, when repeatedly pressed at trial about whether, to his knowledge, she had ever done anything out of the ordinary that might suggest she should be evaluated, he could cite only the fact that she had been referred. Tr. at 607. The clear implication was that she must have done *something* to deserve referral, although he had no idea what it might have been. These comments suggest that Dr. Knour's recommendation was influenced strongly by Captain Schauffert's attitudes and actions.

By no means should the discussion above be construed as suggesting that Lenihan suffers no psychological disability. As I indicated previously, I am unprepared to rule on whether plaintiff exhibits a "definite schizoid personality," or an "inadequate personality with avoidant features," or a "passive aggressive personality disorder," or anything else. Even after hearing

---

**6.** I note here that I do not subscribe to the notion advanced by plaintiff that Drs. Symonds and Knour reached their conclusions on the basis of their own, deeply-ingrained sexist stereotypes. While I do not doubt the validity

of the expert testimony that psychiatrists and psychologists often hold the same sexist attitudes as other members of society, I am not persuaded by anything in the record before me that these stereotypes played a part here.

the testimony of a parade of psychiatrists, I must confess that the features of and distinctions among these various conditions tend to elude me. However, this presents no real problem. It is important to remember that even when an employer has a legitimate policy for discharging an employee, that policy must be applied even-handedly. Therefore, what ultimately concerns this Court, even if Lenihan suffers from all of these conditions at the same time, is whether the Department's decision to survey her was based in any significant part on her sex.

■ It appears from a review of the entire record that Mary Lenihan's performance as a police officer *has* been marginal. Nonetheless, I am convinced that if she had been a male, she would not have been referred to Psychological Services, and would not have been recommended for psychiatric survey. I therefore conclude that she has sustained her burden of proving discrimination under title VII, and I turn to the question of an appropriate remedy.

Section 2000e–5(g) of title VII provides that "[i]f the court finds that the [defendant] has intentionally engaged in ... an unlawful employment practice, the court may enjoin the [defendant] from engaging in such unlawful practice, and order such affirmative action as may be appropriate." 42 U.S.C. § 2000e–5(g) (1982). The framing of a remedial decree is in the trial court's discretion.

If I were thoroughly convinced, as plaintiff suggests, that she suffers no psychiatric disability that renders her unsuitable for full police duty, I would not hesitate to order the Department to restore her to full duty with her firearms. However, I am unable to endorse this claim, and thus I am faced with the unenviable task of devising an appropriate remedy for the defendants' title VII violation. In my view, the only equitable way to accommodate Lenihan's interest in being free from discriminatory treatment on the one hand, and the Department's interest in maintaining control over the utilization of its officers on the other, is to enter an order that restrains defendants from retiring plaintiff on psychiatric grounds based on the record they have compiled to date. Accordingly, I shall enter such an order.

■ Were I unconditionally to enjoin defendants from retiring plaintiff, they would be confronted with insurmountable difficulties if, in the future, she were to evidence the kind of bizarre or dangerous behavior that has formed the basis of decisions to retire male officers. It is not my intention to provide plaintiff with lifetime unconditional tenure at the expense of the Department or the general public. Nor, as I indicated at the outset, am I prepared to intrude any more than necessary into the specialized administrative processes of this organization. Therefore, I will not require the Department to return her firearms or to assign her to motor patrol or to place her in any other specific assignment. Within reason, the Department may utilize her services in any manner it deems appropriate. I note, however, that any sudden determination by the Department that it could most appropriately utilize her services by assigning her to the duties or shifts considered most undesirable among other officers would strongly suggest retaliation, and would not be tolerated.

■ In addition to an injunction against the effectuation of her retirement, plaintiff seeks an order requiring defendants to compensate her for the vacation days she was forced to use in prosecuting this action. That request is granted. The Court is not prepared, however, to grant plaintiff's request for an order directing defendants to purge "all documents, memos or comments relating to the psychological review and evaluations and results thereof conducted since 1978." Plaintiff's Post-Trial Memorandum of Law at 71.

Under § 706(k) of title VII, 42 U.S.C. § 2000e–5(k) (1982), Lenihan is entitled to an award of reasonable attorneys' fees. Accordingly, plaintiff is directed to submit to the Court within fifteen days an itemized statement reflecting her reasonable attor-

neys' fees. Defendants must file any objections within fifteen days thereafter.

## II. Lenihan's Pendent State Claim

Plaintiff acknowledges that monetary damages are not available to her under title VII. She has brought a pendent claim for such damages, however, pursuant to § 296 of the New York Human Rights Law, N.Y. Exec.Law § 296 (McKinney 1982). That statute forbids an employer from, *inter alia*, discriminating against its employees on the basis of sex. Section 297(9) of the state law authorizes any person aggrieved by the specified unlawful discriminatory practices to bring a cause of action for damages in any court of competent jurisdiction. Under appropriate circumstances, these damages may include compensation for mental anguish, humiliation, and emotional trauma. Lenihan presented evidence of such damages at trial, and in her posttrial memorandum she seeks an award of $50,000.

In response, defendants assert first that plaintiff's initial complaint and amended complaint asserted only federal causes of action, and that defendants were thus without notice of her claims for monetary damages. That statement is plainly false; plaintiff asserted the pendent state claim in both her original complaint and her amended complaint, and defendants responded to the allegations in their answer.

■ Defendants next contend that any claim for damages pursuant to § 296 is barred because plaintiff did not serve a notice of claim as required by General Municipal Law § 50–e, N.Y.Gen.Mun.Law § 50–e (McKinney 1982). As plaintiff has properly pointed out, however, § 50–e applies on its face only to tort actions. In addition, the New York courts have specifically ruled that it does not apply to employment discrimination claims brought pursuant to § 296. *See, e.g., Mills v. County of Monroe*, 89 A.D.2d 776, 453 N.Y.S.2d 486 (4th Dep't 1982), *aff'd*, 59 N.Y.2d 307, 464 N.Y.S.2d 709, 451 N.E.2d 456, *cert. denied*, 464 U.S. 1018, 104 S.Ct. 551, 78 L.Ed.2d 725 (1983).

Finally, defendants argue that even if plaintiff is not barred from seeking damages pursuant to this section, her proof was inadequate to support any award. I disagree, although I do not believe the evidence merits an award in the amount sought by plaintiff.

■ Lenihan testified at trial that when her firearms were removed, she was the butt of cruel jokes. Although she offered little testimony of other specific incidents in this context, the circumstances she described throughout the course of the trial support her claim. A claim of damages for mental anguish and humiliation may be established through the testimony of the complainant alone, *Cullen v. Nassau County Civil Serv. Comm'n*, 53 N.Y.2d 492, 442 N.Y.S.2d 470, 425 N.E.2d 858 (1981), and I am satisfied on the basis of plaintiff's testimony that she should recover something here. In my view, an award in the amount of $2,500 will be adequate compensation, because she suffered no loss of income or other proven economic injury.

## III. Lenihan's Due Process Claim

Lenihan seeks relief from this Court not only on the basis of title VII's proscription against intentional discrimination, but also on the ground that the procedures employed by the Department and the Article II Psychiatric Board violated due process in that they were inadequate to safeguard her constitutionally protected liberty interest in being free from a stigmatizing psychiatric diagnosis. My review of the relevant legal authorities leads me to conclude that she is correct, and accordingly, for the reasons summarized below, judgment shall be entered in her favor on this cause of action.

■ The United States Supreme Court has clearly established and regularly reiterated that governmental action implicates constitutionally protected liberty interests when it jeopardizes a person's "good name, reputation, honor or integrity," or when it seriously damages his standing and associations in the community. *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct.

2701, 2707, 33 L.Ed.2d 548 (1972); *see also Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). Moreover, when a government employer proposes action which has "a clear, immediate and substantial impact on [an] employee's reputation [and] which effectively destroys his ability to engage in his occupation," *Tichon v. Harder,* 438 F.2d 1396, 1402 (2d Cir. 1971), adequate procedural safeguards must be employed, *see Roth,* 408 U.S. at 574, 92 S.Ct. at 2707.

It is now well-settled that a finding of mental disability or unfitness imposes precisely the kind of stigma that implicates constitutionally-protected liberty interests. As the Court of Appeals for the Second Circuit has ruled, such a finding deprives an individual of his "reputation as a person ... presumably free from mental disorder," and creates "a heavy burden for a young person to carry through life." *Lombard v. Board of Educ.,* 502 F.2d 631, 637 (2d Cir.1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975); *see also Newman v. Board of Educ.,* 594 F.2d 299 (2d Cir.1979); *Laurido v. Simon,* 489 F.Supp. 1169, 1177 (S.D.N.Y.1980) ("[P]lacing a permanent Civil Service employee on an involuntary leave of absence based on a finding of mental unfitness implicates liberty ... interests protected under the Due Process Clause of the Fourteenth Amendment."). I am fully satisfied, on the basis of these authorities, that Lenihan's liberty interests are implicated in the action of the Article II Psychiatric Board, and the Board of Trustees of the Police Pension Fund. I

therefore consider the issue of necessary and appropriate procedural safeguards.[7]

The Court readily recognizes that due process is a flexible concept, and that various factors must be considered in determining which safeguards are necessary to protect against an unlawful deprivation in given circumstances. As correctly pointed out by defendants, due process does not necessarily mean a full adversary hearing, and it may, in some circumstances, be satisfied by informal proceedings. Traditionally, due process analysis focuses upon the kind of notice and hearing that are likely to establish the validity of the deprivation in question.

There is authority in this circuit which suggests that a full adversary hearing might well be required in circumstances such as these. For example, the Second Circuit noted in *Lombard,* 502 F.2d at 637–38, that a serious constitutional question would arise if an administrative body made a finding of mental illness without giving its subject an "opportunity to meet the charge by confrontation in an adversary hearing." I look also to *Newman,* 594 F.2d at 303–06, to *Laurido,* 489 F.Supp. at 1177–78 ("[B]efore ... an involuntary leave [on the basis of mental unfitness] may be effectuated, the employee is entitled to notice of the facts on which the employer's determination is made and an adversarial-type hearing."), and to *Snead v. Department of Social Servs.,* 355 F.Supp. 764, 772 (S.D.N.Y.1973).[8]

---

7. Defendants have argued that "plaintiff cannot claim that she has been stigmatized by her employer's actions [because the Department has not made known] the reasons for her retirement to the public," and will not do so without prior authorization from plaintiff herself. Defendants' Post-Trial Memorandum of Law at 80–81. However, this argument is unpersuasive. In *Velger v. Cawley,* 525 F.2d 334 (2d Cir.1975), *rev'd on other grounds sub nom. Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), the Second Circuit recognized that stigmatization could result even where information was not actively disseminated by authorities. *Velger* involved a rookie police officer who had been discharged for putting a revolver to his head in an apparent suicide attempt. In response to an

argument that there was no stigma because personnel files were confidential, the court said:

New York City answers all inquiries for permission to see personnel files with the suggestion that inspection will be permitted with the consent of the dischargee. The dischargee is then placed "between the devil and the deep blue sea"; he loses whatever his choice. Who would employ an applicant who refused to give authorization? Who would employ one who gives authorization but whose file suggests that he made an "attempt" at suicide?

*Id.* at 336.

8. In *Snead,* a three-judge district court determined that the section of New York's civil service law governing leaves of absence for mental-

■ While these cases strongly suggest that an adversarial hearing of some type should have been provided here, I need not and therefore do not reach that question. I am satisfied that even if a full adversary hearing was not required, the procedure afforded plaintiff was plainly inadequate to protect her constitutional rights.

First of all, with respect to the fundamental question of adequate notice of proceedings before the Article II Psychiatric Board, the testimony of defendants' own witness was that, generally, officers are advised of the date and time at which they must report by a roll call officer, and that no written notice is provided. The roll call officer is supposed to advise the subject that he or she may present documentary evidence at the hearing, but there is no procedure to guarantee that the message is properly relayed to the officer. Significantly, there is no policy with respect to a minimum notice period; an officer may get a month's notice or just one day's notice. Tr. at 941–46. Attorneys are not permitted to attend hearings before the Article II Psychiatric Board, but they are permitted to obtain copies of the subject's medical records. No one outside of the Department is permitted to examine the P.A.15.

I cannot conclude that these general procedures are sufficient to provide police officers with meaningful notice of the charges against which they must defend. Even assuming that an officer will somehow be adequately apprised of the charges against him or her, I find it difficult, if not impossible, to believe that the officer could prepare for a hearing before the Article II Psychiatric Board with a day's, or even a week's notice. When I consider this testimony in conjunction with the testimony of defendants' witness, Deborah Zoland, who stated that it generally takes from three to six weeks for attorneys to obtain copies of medical records from the Department, and with the testimony of Dr. Koz, who suggested that it was unusual and inappropriate for an officer to request that an adjournment be given so that he or she might obtain documentation, there is no question in my mind that adherence to these policies effectively ensures that the Article II Psychiatric Board will be presented with in-

ly unfit employees was unconstitutional. The decision of the three-judge court was subsequently appealed, and the dispute then followed a tortuous procedural path. The Supreme Court remanded the case for reconsideration in light of *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), and the three-judge court reaffirmed its earlier decision, 389 F.Supp. 935 (S.D.N.Y.1974). On a subsequent appeal, the Supreme Court remanded the case for consideration of whether the questions presented had become moot. 421 U.S. 982, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1975). The three-judge court again ruled in the plaintiff's favor, 409 F.Supp. 994 (S.D.N.Y.1975), and after a third trip to Supreme Court, the action was dismissed for lack of standing, on the ground that the statute in question had never actually been applied to the plaintiff, 425 U.S. 457, 96 S.Ct. 1630, 48 L.Ed.2d 88 (1976). Thus, the original *Snead* opinion represents dictum. Nonetheless, in that opinion, Judge Weinfeld offered a thoughtful analysis that seems particularly relevant here:

> There can be little doubt that the doctor's and appointing authority's ultimate conclusions as to mental fitness are predicated in part upon their judgments concerning the truth or falsity of the charges which prompted the examination. To this extent, the inquiry is factual in the traditional sense, and there is no reason for believing that a psychiatric examination is an appropriate means of resolving such factual disputes. At the interview the employee is placed in the position of having to explain incidents charged by accusers he is not permitted to confront and described in a file seen by the psychiatrist but unseen by him. He has no opportunity to present witnesses who might rebut his accusers or to retain the assistance of counsel in the preparation or presentation of his case. Unless doctors are deemed to possess an omniscience which our legal system refuses to attribute to the most experienced judges, they cannot be expected to make fair and accurate factual determinations under such circumstances. Even to the extent that the ultimate determination of mental fitness depends upon the judgment of a doctor based exclusively on his observations of the employee at the examination, fairness requires that the employee have an opportunity to challenge the doctor's conclusions and present his own medical evidence. Our jurisprudence does not recognize the opinion of any individual expert as infallible; professional judgments concerning mental fitness are just as likely to differ as the observations of layman regarding simple issues of fact.

355 F.Supp. at 772.

complete information and will be confronted by bewildered officers who are in no position to mount any attack against unsubstantiated charges levelled by Department personnel.

According to Lenihan's uncontroverted testimony, she received approximately one week's notice that she was required to appear before the Board. Tr. at 311. She was provided absolutely no information about why she was being sent, tr. at 459, and she was never advised that she had a right to bring evidence to the hearing. As a result, she was forced to request an adjournment and, although under ordinary circumstances I might have concluded that the granting of that adjournment mitigated any damage caused by the Department's failure to give her adequate prior notice, it is clear to me that Lenihan was later penalized by the chairman of the Psychiatric Board for having made that request.[9] Accordingly, I find that on its face and as applied to Mary Lenihan, the Department's notice procedure violates rudimentary due process requirements.

Even more significant to my consideration of the merits of Mary Lenihan's claim is the fact that the Department refused to grant her access to the one document that apparently had the greatest influence on her evaluators: the P.A.15. Dr. Symonds relied heavily on the incident reports contained in this document, as evidenced by the fact that he quoted from it. Dr. Knour did not review the P.A.15 before his evaluation of Lenihan, but he did admit at trial that he rested some of his conclusions on Dr. Symonds's description and analysis, including the statements about her perform-

ance as a correction officer. Tr. at 587–88. Dr. Koz did not review the P.A.15 either, but admitted that he relied heavily on Symonds's evaluation, tr. at 175, and cited those incidents which were excerpted in Symonds's report as evidence of Lenihan's poor performance record overall. In fact, Dr. Koz mistakenly believed that the P.A.15 contained evaluations of her performance as a police officer. Tr. at 173–74.

Even though Lenihan was granted an adjournment and thus had additional time to prepare for her appearance before the Board, she could hardly have known what relevant and probative evidence to submit on her own behalf when she was unaware of the evidence the Board already had before it. Defendants' argument that the Board did not rely exclusively on the P.A.15 in reaching its conclusion is not persuasive; the P.A.15 was obviously a critical document, and the fact that Lenihan had no access to it is, in my mind, fatal to any claim by defendants that she had a meaningful opportunity to be heard in her own defense.

I also find it somewhat distressing that in making its final determination that Lenihan should be recommended for survey, the Article II Psychiatric Board never bothered to explain the basis upon which it ultimately rejected the Kaminstein Board's original diagnosis of "definite schizoid personality" in favor of Dr. Knour's diagnosis of "inadequate personality disorder with avoidant features." In my view, this approach reflects an absence of the kind of due and deliberate consideration given to important matters such as this by rational decisionmakers.[10] Moreover, the fact that

---

**9.** Dr. Koz testified at trial that it was "against regulations" for plaintiff to request a month's adjournment. Tr. at 207. When pressed by plaintiff's counsel as to what he meant, the following discussion occurred:

> Dr. Koz: Perhaps the words "against regulations" is not correct. Usually the officers when they appear before the Board are given adequate warning and notice and are told when, what and how they must prepare themselves for the Board hearing. It is unusual.
> Counsel: Who tells them that?
> Dr. Koz: I believe the Police authorities.

> Counsel: Do you know how much time [Mary Lenihan] had prior to her appearance before your Board?
> Dr. Koz: I presume it was adequate time.

> Counsel: You don't know?
> Dr. Koz: No.
> Tr. at 208.

**10.** The report of Lenihan's first appearance before the Kaminstein Article II Psychiatric Board states that plaintiff had been diagnosed "as hav-

the Board failed to mention why it rejected the documentary evidence submitted by Lenihan's doctors—and in fact removed all reference to these conflicting evaluations from its report—taken together with Dr. Koz's statement at trial that he tends to be skeptical of outside reports, gives me no confidence in defendants' suggestion that the procedures used by the Department are—or were in Lenihan's case—fundamentally fair.

For all of the aforementioned reasons, I conclude that the procedures utilized by defendants violated due process of law, and that if the recommendation of the Article II Psychiatric Board and the final action of the Board of Trustees are given effect in this case, plaintiff will have been deprived unconstitutionally of a protected liberty interest. Accordingly, defendants are hereby enjoined from terminating her employment pursuant to those directives.

*Conclusion*

For all of the foregoing reasons, Lenihan is entitled to a judgment enjoining defendants from terminating her employment, subject to the conditions stated above, and awarding her damages in the amount of $2,500. Plaintiff is directed to submit within ten days a proposed judgment and an itemized statement reflecting her reasonable attorneys' fees. Defendants may submit a proposed counterjudgment and any objections to plaintiff's request for attorneys' fees within ten days thereafter.

SO ORDERED.

ON MOTION FOR RECONSIDERATION

In an Opinion and Order dated December 16, 1985, and amended on December 19, 1985, familiarity with which is presumed, I concluded that defendants discriminated against plaintiff on the basis of her sex, and violated her due process rights. However, I denied plaintiff's request that I order defendants to purge "all documents, memos or comments relating to the psychological review and evaluations and results thereof conducted since 1978."

By letter dated December 19, 1985, plaintiff has requested reconsideration of my decision to the extent that I denied plaintiff's request that her records be expunged. Plaintiff's motion for reconsideration is granted. Having considered plaintiff's request and defendants' response thereto, my Opinion and Order is supplemented as follows:

Defendant New York City Police Department is ordered to include in plaintiff's personnel file copies of the trial testimony of Dr. Naomi Goldstein and the Court's December 16, 1985 Opinion and Order as amended. The Court made clear in its Opinion and Order that the defendants' ultimate determination to survey plaintiff on psychiatric grounds was tainted by discriminatory intent. However, the Opinion also expresses the Court's view that some of the psychological and psychiatric reports in plaintiff's file *may* tend to show the existence of a personality disorder. Therefore, although the reports may have limited probative value, the defendants should not be foreclosed from considering them.

SO ORDERED.

---

ing a schizoid personality with passive aggressive traits." Exh. N. The passive aggressive characteristics had not been mentioned by Dr. Symonds in his evaluation, which was apparently the only psychiatric evaluation before the Board. When Dr. Koz was asked at trial from where this statement derived, he responded, "You would have to ask Dr. Kaminstein." Tr. at 127. When subsequently asked whether *he* had ever asked Dr. Kaminstein, he replied that he had not. *Id.*

The next Kaminstein Board report states that Lenihan is "a definite schizoid personality." Exh. O. Thus, the passive aggressive traits apparently disappeared without a trace.
By the time the Koz Board issued its final recommendation, plaintiff suffered from an "inadequate personality disorder with avoidant features." Exh. T. The report contains no reference to a schizoid personality, and no explanation of how plaintiff might have overcome her passive aggressive traits.