Francine NEWMAN, Appellant,

v.

The BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF NEW YORK, Appellee.

No. 70, Docket 78–7152.

United States Court of Appeals, Second Circuit.

Argued Nov. 6, 1978.

Decided Feb. 21, 1979.

Joan E. Goldberg, New York City, for appellant.

L. Kevin Sheridan, New York City (Allen Schwartz, Corp. Counsel, New York City, of counsel), for appellee.

Before FRIENDLY, MANSFIELD and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Francine Newman, a licensed tenured teacher in the New York City school system, who was on July 31, 1970, found mentally unfit for teaching duty by the Board of Education of the City School District of New York ("Board") and beginning in September 1970 placed on an involuntary leave of absence without pay except for accumulated sick leave, appeals from a summary judgment order of the Eastern District of New York, Thomas C. Platt, Judge, dismissing her complaint against the Board seeking a declaratory judgment to the effect that the Board violated her procedural due process rights in violation of both Title 42 U.S.C. § 1983 and the Fourteenth Amendment when it failed to provide her with an adversarial hearing before finding her unfit to teach. Her complaint also sought annulment of the Board's finding, reinstatement, restoration of her accumulated sick leave, and back-pay. An earlier order of the Eastern District of New York dismissing her complaint was reversed by us and remanded for further proceedings. See *Newman v. Board of Education*, 508 F.2d 277 (2d Cir.), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975). Upon this appeal we reverse the district court's order and remand for further proceedings.

From 1945 until 1970 appellant was employed in the New York City public school system, first as a substitute teacher of health education and later, beginning in June 1955, as a licensed tenured teacher of such education in senior high schools. During all of these years through 1969 she had "satisfactory" ratings and was the recipient of more than 28 commendations for her teaching ability. For the academic year 1969–70, however, her services were rated as "unsatisfactory" for the reasons noted below.

By letter dated January 26, 1970, David Gordon, the principal of the Far Rockaway High School where appellant was employed, asked the Superintendent of Schools to have appellant examined by the Medical Division of the Board of Education pursuant to § 2568 of the N.Y. Educ. Law[1] to determine her mental capacity to perform her duties. Mr. Gordon set forth in detail conduct on appellant's part indicating possible mental instability. Thereafter, beginning on February 13, 1970, and on various occasions thereafter until November 29, 1971, appellant was at the direction of the Medical Division given a series of medical examinations, including examinations by medical doctors, psychiatrists and psychologists. As a result of reports from some of these doctors (Drs. Wright, Wallfield, Isenberg and Prensky) the Medical Division, in a report dated July 7, 1970, found appellant "Not fit at present for teaching duty" and placed her on "Leave of absence for purpose of health improvement until June 30, 1971."

1. Section 2568 of the New York Education Law provides:

"The superintendent of schools of a city having a population of one million or more shall be empowered to require any person employed by the board of education of such city to submit to a medical examination by a physician or school medical inspector of the board, in order to determine the mental or physical capacity of such person to perform his duties, whenever it has been recommended in a report in writing that such examination should be made. Such report to the superintendent may be made only by a person under whose supervision or direction the person recommended for such medical examination is employed. The person required to submit to such medical examination shall be entitled to be accompanied by a physician or other person of his own choice. The findings upon such examination shall be reported to the superintendent of schools and may be referred to and considered for the evaluation of service of the person examined or for disability retirement."

Prior to taking this action the Board did not give appellant any opportunity either to examine the medical reports and other data forming the basis of its action or to rebut the reports. No hearing was held at which the medical experts might be cross-examined.

Following her being placed on involuntary medical leave appellant was required to exhaust her 200 days of "sick leave" which she had accumulated on the basis of 10 days per year. When her involuntary leave of absence terminated on June 30, 1971, she was not allowed to resume work. Instead the Board in September, 1971, directed that she submit to further medical examinations. Two medical doctors (Drs. Lazarus and Cinque) examined her on October 18, 1971, at the Board's request and found her fit to return to duty. However, pursuant to the Board's direction she was then examined on November 18 and 29, 1971, by a psychiatrist (Dr. Schnee), who concurred in the earlier diagnosis by Dr. Isenberg, also a psychiatrist, and concluded that her "mental status is Passive aggressive Personality, aggressive type, severe and is not fit to perform the duties of a teacher." As a result she was found to be unfit for return to duty and her involuntary leave, by notice dated December 22, 1971, was extended to June 30, 1972.

In an effort to rebut the Board's evaluation of her competency to teach, appellant consulted two private psychiatrists (Drs. Valicenti and Shea) and a psychologist (Dr. Fisher) for an independent appraisal of her condition. In contrast to the doctors designated by the Board, each of whom had examined appellant once (except for Dr. Schnee who interviewed her twice), one of the psychiatrists consulted by appellant (Dr. Valicenti) interviewed her once a week over a seven-week period in September-October 1970, and the other (Dr. Shea) examined her three times in November, 1971, and once in February, 1972. Each of the two psychiatrists reported that he found no neurotic or psychotic trends or any problems that would interfere with her performance of her duties as a teacher. Their reports were confirmed by the findings of the psychologist after testing. These reports were submitted to the Board and read by the Assistant Director of the Medical Division of the Board, who "did not give them much weight."

During the period from August, 1970, to November 8, 1971, appellant made seven requests to the Board for release to her or to her physician of the various reports that were furnished to the Board by the doctors who had examined her at its direction and which formed the basis for the Board's action. Prior to her institution of the present lawsuit in April, 1973, the Board did not furnish her with the requested copies, although on July 31, 1970, she received a copy of the Medical Division's summary dated July 7, 1970, consisting of three short paragraphs, concluding that appellant was "hypomanic," that her "record showed an excitable, neurotic woman," that her control was "poor, she is explosive and impulsive," and that her "psychoneurosis and passive aggressive personality characterized also by poor judgment and no insight, are deemed to impair her ability to perform her duties"; and her psychiatrist, Dr. Valicenti, received a letter dated December 1, 1970, from the Board's Medical Director to the effect that "she had a psychoneurosis; a passive aggressive personality disorder characterized by poor judgment, lack of insight, explosive and impulsive behavior which impaired her ability to perform her duties."

In the meantime, on September 4, 1970, appellant, proceeding under the then-existing contract between the Board and the United Federation of Teachers, a union of which she was a member, requested a review of the Medical Division's July 7, 1970 recommendation by an *ad hoc* committee of physicians. This request was denied on October 27, 1970, by the Deputy Superintendent of Schools on the ground that appellant had not exhausted her 200 days of accumulated "sick leave." An arbitration, consented to by the parties, resulted in her appeal from this ruling being denied on September 28, 1971, for the reason that under the terms of the labor contract and the Board's by-laws the Board had the right to compel

appellant to exhaust her cumulative sick leave reserve, which had not yet expired, prior to formation of an *ad hoc* committee.

Thereupon appellant, on March 2, 1972, commenced a proceeding under Article 78 of the N.Y.C.P.L.R. in the Kings County Supreme Court seeking (1) to set aside the Board's determination that she be placed on involuntary leave of absence, (2) restoration of her sick leave, and (3) copies of all medical reports furnished to the Board by doctors who had examined her at its instance. In a decision dated May 17, 1972, Justice Heller denied appellant's petition insofar as it sought relief for the period from September 11, 1970, through June 30, 1971, on the ground that this portion of the·claim was barred by the four-month statute of limitations provided in C.P.L.R. § 217. The balance, which dealt with the 1971–72 school year, was remanded to the Board on the ground that under the circumstances, including the conflict between the Board's doctors and those consulted by appellant, the record was "incomplete" and inadequate "to establish that there was a reasonable basis for placing the petitioner in the status of an inactive employee without pay from November 7, 1971." The court further took the view that neither the collective bargaining agreement nor any statute or law gave appellant the right to examine the various medical reports submitted by physicians to the Board.[2] It remanded the matter to the Board for a possible re-examination of appellant, consideration of all medical reports (including that resulting from the re-examination) and a new recommendation by the Medical Director to the Board. In all other respects the application was denied. Appellant was denied leave to appeal this decision to the Appellate Division, Second Department.

Upon remand the Board requested appellant to submit to further medical examinations, which·she refused to do, having already been subject to seven Board-directed medical examinations and having been re-fused copies of the doctors' reports of those examinations.

On April 5, 1973, appellant commenced the present action in the Eastern District of New York. On February 15, 1974, former Judge Travia granted defendant's motion for summary judgment dismissing the complaint on the ground that the state court's determination was *res judicata,* which we reversed on the basis of *Lombard v. Board of Education,* 502 F.2d 631 (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975), remanding the case for further proceedings. *Newman v. Board of Education,* 508 F.2d 277 (2d Cir.), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975). Upon remand Judge Judd denied the Board's renewed motion for summary judgment, which was sought principally on the ground that the Board was not a "person" within the meaning of 42 U.S.C. § 1983, stating that our decision reversing summary judgment and remanding the case for further proceedings represented the law of the case, and that consideration must be given to appellant's counter-motion for summary judgment and to the remedy to which plaintiff would be entitled because of denial of due process by the Board.

On March 8, 1976, we handed down our decision in *Monell v. Department of Social Services,* 532 F.2d 259 (2d Cir. 1976), which led to the Board's moving again for summary judgment. By decision dated December 9, 1977, Judge Platt granted the motion, holding (1) that appellant was not entitled to reinstatement or other equitable relief because she had refused to submit to further Board-directed medical examinations as suggested by Justice Heller, (2) that the available procedure whereby appellant could submit reports by her own doctors and psychiatrists to the Board satisfied due process requirements, (3) that there had not been any violation of appellant's liberty interests within the meaning of *Lombard v.*

---

2. In so holding, Justice Heller relied upon two earlier decisions which provided no reasoning for the result reached, *Silverman v. Moss,* 107 N.Y.S.2d 475 (Sup.Ct.1951), and *Kropf v. Board* *of Education,* 34 Misc.2d 8, 228 N.Y.S.2d 62 (Sup.Ct.1962), *affd.,* 18 A.D.2d 919, 238 N.Y. S.2d 757 (1963).

*Board of Education,* in the absence of proof of publication of the findings of the Board's doctors, psychiatrists and psychologists, (4) that our decision in *Monell* precluded recovery of damages from the Board under 42 U.S.C. § 1983, and (5) that a claim for money damages does not lie directly under the Fourteenth Amendment. The present appeal is from this decision and order.

## DISCUSSION

In view of the Supreme Court's later holding in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that municipalities are liable in damages under § 1983, one ground relied on by the district court falls.

■ Turning to the merits, under New York law a tenured teacher in New York City schools may not be removed from office without a hearing. *Kobylski v. Agone,* 37 Misc.2d 255, 261–64, 234 N.Y.S.2d 907, 913–16 (Sup.Ct.1962), *affd.,* 19 A.D.2d 761, 242 N.Y.S.2d 630 (1963); *Glass v. Board of Education,* 21 A.D.2d 891, 251 N.Y.S.2d 805 (1964), *affd.,* 16 N.Y.2d 982, 265 N.Y.S.2d 294, 212 N.E.2d 779 (1965); *Boyd v. Collins,* 11 N.Y.2d 228, 233, 228 N.Y.S.2d 228, 232–33, 182 N.E.2d 610, 613 (1962). On the other hand, the Superintendent of Schools of New York City has been empowered, upon written recommendation of the principal of a school, to require a tenured teacher to submit to a medical examination to determine his or her mental fitness to perform the duties of the office, N.Y.Educ.Law § 2568. See also N.Y.Educ.Law §§ 2554, 2566 and § 106, subdiv. 7a of the By-Laws of the Board of Education of the City of New York.[3] New York's highest court has ruled that these laws entitle the Board of

Education, without a hearing, to place a teacher found medically unfit in the status of an "inactive employee" or a employee on leave of absence without pay. *Brown v. Board of Education,* 16 N.Y.2d 1021, 265 N.Y.S.2d 903, 213 N.E.2d 314 (1965). See also *Madison v. Gross,* 28 A.D.2d 523, 279 N.Y.S.2d 789 (1967). Although suspension of a teacher without a hearing on grounds of medical unfitness may become protracted as to amount to the practical equivalent of removal from office, the reasoning of the New York Court of Appeals appears to be that a teacher who has been placed on inactive status for medical reasons, as distinguished from one who has been suspended or removed, retains all of his or her rights as a licensed tenured teacher and "under subdivision 7a of section 106 of the by-laws of the Board of Education . . may at any time apply to the medical bureau of the Board of Education and the Superintendent of Schools to terminate her inactive status and, in the event of an adverse decision, may review it in an Article 78 proceeding," *Brown v. Board of Education, supra,* 16 N.Y.2d at 1022, 265 N.Y.S.2d at 904, 213 N.E.2d at 314. See also *Brown v. Board of Education,* 23 A.D.2d 850, 259 N.Y.S.2d 179 (1965).

■ Having been placed by the Board on an inactive status without pay on grounds of mental unfitness, appellant contends that the denial of a hearing and refusal to turn over to her or her physician for rebuttal the medical reports upon which the Board based its action amounted to denial of her due process rights under the federal Constitution. In resolving this issue we are guided by basic principles that were well stated by Justice Powell in *Mathews v. Eldridge,* 424

---

**3.** Subdivision 7a of § 106 of the By-Laws of the Board of Education of the City of New York at the time appellant was placed on involuntary medical leave of absence provided in relevant part:

"A member of the teaching and supervising staff who has exhausted the number of days accumulated to his credit for excuse of absence with pay, owing to personal illness, and who, in the opinion of the Medical Bureau of the Board of Education, will not be able to return to full service within one calen-

dar month from the date the reserve is exhausted, shall be declared by the Superintendent of Schools in the status of an inactive employee without pay. Such employee shall immediately apply for and accept a leave of absence without pay for restoration of health. . . . Such status and such leave of absence without pay may be terminated at any time by the Superintendent of Schools upon the recommendation of the Medical Bureau of the Board of Education."

U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976):

"These decisions underscore the truism that ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961). '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey v. Brewer,* 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 480] (1972). Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Arnett v. Kennedy* [416 U.S. 134], at 167–168 [94 S.Ct. 1633, at 1650–1651, 40 L.Ed.2d 15] (Powell, J., concurring in part); *Goldberg v. Kelly* [397 U.S. 254], at 263–266 [90 S.Ct. 1011, at 1018–1020, 25 L.Ed.2d 287]; *Cafeteria Workers v. McElroy, supra* [367 U.S.], at 895 [81 S.Ct., at 1748–1749.] More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, *e. g., Goldberg v. Kelly, supra* [397 U.S.], at 263–271 [90 S.Ct., at 1018–1022.]"

In short, due process under some circumstances may require a full scale trial-type pre-removal evidentiary hearing, cf. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (termination of welfare benefits); *Wheeler v. Montgomery,* 397 U.S. 280, 90 S.Ct. 1026, 25 L.Ed.2d 307 (1970), but under others may be satisfied by much more informal procedures.

Here the private interest at stake—the right of a tenured teacher to continue practicing her profession, free of any stigma flowing from an indefinite suspension attributable to mental unfitness—is substantial indeed. Cf. *Lombard v. Board of Education,* 502 F.2d 631, 637–38 (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975) (untenured teacher). In view of the inexactness of psychiatry as a science, it would be unrealistic not to recognize the risk of loss of this valuable interest on the basis of one or two interviews with psychiatrists which might result in irreparable harm to an individual placed on "inactive status," regardless of whether he or she may have the right to seek restoration to an active status. Although the public clearly has an interest in ridding classrooms of mentally unfit teachers promptly and without undue burden or expense, this is counterbalanced not only by the due process interests of the teacher but also by the public's interest in attracting competent instructors to assume teaching positions in our public schools by the assurance that they will not be suspended unfairly or through error.

■ In weighing these factors here we are satisfied that appellant, important as was her interest in retaining her position, was not entitled as a matter of due process to an adversarial hearing before being placed on leave of absence for mental unfitness; the risk of harm that might occur if a teacher believed to be mentally unfit were permitted to continue teaching is too great to insist on retention while the issue of mental fitness is being resolved. The situation is one where the teacher's due process interest should be satisfiable through post-suspension procedures. See, *e. g., Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Indeed, this was implicitly recognized by the New York Court of Appeals' holding in *Brown v. Board of Education, supra,* that the interest of a teacher placed on inactive status for mental unfitness was adequately protected by his or her right to petition the Board for restoration to active status and to obtain state court

review of a denial by way of an Article 78 proceeding. In this case appellant did follow that route, achieving success to the extent that she obtained from the State Supreme Court a remand to the Board of her claim to the extent that it was not time-barred.

Ordinarily we would be inclined to affirm the district court's dismissal of the complaint on the ground that the availability of the foregoing post-suspension procedures satisfied appellant's due process rights. However, the record reveals that these procedures, as applied in the present case, did not and would not, even on remand to the Board as ordered by the New York Supreme Court, provide rudimentary fairness to appellant with respect to the key issue in the case—her mental fitness—because neither she nor her physicians, despite repeated requests, were ever permitted to inspect the reports of the doctors relied upon by the Board (Drs. Wright, Isenberg, Wallfield, Prensky, Lazarus, Schnee and Cinque). Some of these reports to the Board were in fact favorable to appellant in the sense that they found no physical impediment to her resumption of teaching duties, whereas the reports of the two Board psychiatrists (Drs. Isenberg and Schnee) were unfavorable to appellant and undoubtedly relied upon by the Board in placing appellant on inactive status on grounds of mental unfitness to teach. For present purposes the important factor is that if the detailed reports themselves had been furnished to appellant's physicians and psychiatrists (including Drs. Valicenti and Shea) appellant would have had the opportunity to test the credibility, weight and accuracy of the reports relied upon by the Board, to offer a point-by-point rebuttal, and to furnish a more meaningful response based on the far more extensive examinations and interviews of appellant that had been conducted by her psychiatrists.[4] We believe that as a matter of fundamental fairness, access to the detailed evidence relied upon by the Board is essential to enable a suspended teacher (1) to demonstrate possible erroneous assumptions by the Board with respect to material facts, or errors in reasoning or analysis on the part of the Board's doctors, (2) to offer pertinent contrary evidence, and (3) to have a fair opportunity to persuade the Board that continuation of the teacher on an inactive status for mental unfitness is unjustified. The Board of Education has conceded before this court that appellant was denied procedural due process by the failure of the Board to make available to her "a more detailed statement of the reasons for her being involuntarily placed on unpaid leave status" and by its failure to provide her "a subsequent meaningful opportunity to be heard on and to controvert the evidence relied upon" by the Board.

In short, a terminated teacher's right to submit her doctors' reports is of extremely limited value without their first having in hand the findings, analyses and conclusions of the Board's medical experts, together with the evidence relied upon by them. We believe that the Board, having assumed the burden of proving appellant to be medically unfit, should as a matter of fundamental fairness and rudimentary due process have made available to appellant's doctors copies of the medical reports received from its own doctors.

For these reasons we hold that, beginning in August, 1970, when appellant first asked the Board to make its doctors' reports available to her or her physicians, and continuing until October, 1972, when appellant refused to submit to a Board medical examination pursuant to the order of Justice Heller, appellant was denied procedural due process. Although the Board would not thereafter have made its medical reports

---

4. Indeed, since *Brown v. Board of Education, supra,* the New York Court of Appeals has apparently modified its position to the extent of holding that an employee who has been involuntarily retired for mental unfitness, although not entitled to a full-blown adversary hearing, has "the right to be informed of the substance of [the City's medical] reports and should have been given an opportunity . . . to controvert the conclusions they contained." *Balash v. New York City Employees' Retirement System,* 34 N.Y.2d 654, 355 N.Y.S.2d 577, 311 N.E.2d 649 (1974).

available to appellant or her physicians, we believe that, having invoked the state court's process in an Article 78 proceeding, appellant was under a duty to comply with that court's directions as a condition precedent to continuing her claim of denial of due process. A new Board-ordered medical examination might well have confirmed the diagnoses of her own physicians, leading to reconsideration by the Board and reinstatement. Certainly appellant stood to lose nothing, other than to risk that the new medical examination would confirm the Board's earlier finding of unfitness. However, even assuming continuation of the denial of procedural due process arising out of the Board's failure to furnish its medical reports to her physicians for rebuttal, ultimately any claim of damages would rest on whether, had she been accorded procedural due process, she would have been adjudged mentally fit to teach. *Carey v. Piphus*, 435 U.S. 247, 259–60, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).[5] Additional evidence from professional experts on this crucial issue was relevant and possibly essential. Since appellant's refusal to submit to re-examination precluded the parties from obtaining this timely and relevant evidence, it should also preclude appellant from asserting a claim for continuation of the denial of due process thereafter.

Accordingly the order and judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with the foregoing. Upon remand appellant may offer such additional evidence as would have been proffered by her if the Board's medical reports had been provided to her as originally requested, in which event the burden will shift to the Board to show that appellant would not have been reinstated. Any decision with respect to an award of back pay during the period when appellant was denied due process shall not preclude her seeking current reinstatement.

---

**5.** Compensable damages are also available under § 1983 for mental or emotional distress caused by a denial of procedural due process. There must be proof, however, that such injury

actually was caused by the denial. *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).