426 F.3d 187
 Thomas O'CONNOR, Plaintiff-Appellant,
v.
Lynne B. PIERSON, Ellen C. Healy, Christopher A. Dumas, Patricia Strong, Christine T. Fortunato, Donna T. Hemmann, Stacey Hodges, John F. Morris, Frederick E. Petrelli, Jr., Penny H. Stanziale, and Wethersfield Board of Education, Defendants-Appellees.
Docket No. 04-0224-CV.
 United States Court of Appeals, Second Circuit.
 Argued February 2, 2005.
 Decided October 11, 2005.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Leon M. Rosenblatt, West Hartford, Connecticut, for Plaintiff-Appellant.
 Michael J. Rose, Howd & Ludorf (Alexandria L. Voccio, John J. Radshaw, III, on the brief), Hartford, Connecticut, for Defendants-Appellees.
 Before: WALKER, Chief Judge, HALL and GIBSON,* Circuit Judges.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 After being placed on administrative leave pending an investigation, plaintiff-appellant Thomas O'Connor, a teacher working for the Wethersfield Board of Education, was invited back to work conditioned on a psychiatric examination and his release of past medical records. O'Connor's lawsuit in state court, removed to federal court, asserted procedural and substantive due process claims in opposition to the Board's conditions. The district court granted summary judgment for the Board. We affirm in part, vacate in part, and remand.
 
 I. BACKGROUND
 
 2
 Thomas O'Connor, an English teacher and track coach, started teaching in the Wethersfield public schools in 1982 and achieved tenure under the Connecticut Teacher Tenure Act, Conn. Gen. Stat. § 10-151, before this case began. In early 1999, the Wethersfield Board of Education received a number of complaints from students, their parents, and other teachers about O'Connor's behavior. These complaints included allegations that O'Connor used foul language and made sexual remarks to students, yelled at a fellow teacher, and breached school security. After meeting with O'Connor on March 25, 1999, the Assistant Superintendent of Schools, Robert Buganski, placed him on "administrative leave with pay and without prejudice" pending the outcome of an investigation into the complaints.
 
 
 3
 A few days later, O'Connor's cardiologist, Dr. Fred Rubin, wrote to Buganski that O'Connor was ill with chest pain, anxious, and depressed, and that Rubin had advised O'Connor to take an indefinite leave of absence. O'Connor remained suspended with full pay.
 
 
 4
 During the summer and into the fall, the Board investigated the charges against O'Connor. As the investigation was nearing completion in late October, Buganski wrote to O'Connor requesting the medical assessment of O'Connor's fitness to resume teaching that O'Connor had promised to provide during a meeting with Buganski in August. On October 25, 1999, Rubin wrote to Buganski that
 
 
 5
 Mr. O'Connor is doing well from a cardiac standpoint and, from that view, he could return to work. However, I am extremely concerned about his severe anxiety and worry that this will affect his health problems. However, I am not a psychiatrist nor am I his general physician. I would strongly suggest that these issues be directed to his general physician.
 
 
 6
 On November 4, 1999, Lynne B. Pierson, Ed.D., the Superintendent of Schools, issued a report summarizing the results of the Board's investigation into O'Connor's conduct. Although the investigation did not bear out all of the initial allegations, Superintendent Pierson concluded that O'Connor had "violated the standards of conduct for a teacher in many respects." Pierson did not recommend firing O'Connor. Instead, she informed O'Connor that he would, on pain of termination, have to work with the administration to improve his performance. Pierson instructed O'Connor to schedule a meeting to develop a remediation plan; the record does not indicate whether he did so.
 
 
 7
 On November 5, 1999 (the day after Pierson issued the report), Assistant Superintendent Buganski wrote to O'Connor that "it appears that you are medically cleared to return to work" but requested that O'Connor contact Buganski immediately to confirm his ability to return to work. Buganski further noted, "If, however, your health prevents you from returning to work at this time, you will be placed on sick leave pending review of documentation concerning any such health issues." O'Connor informed the Board that he had an appointment with Dr. Rubin on November 22, 1999, and expected Rubin to certify the next day that he could return to work.
 
 
 8
 No letter from Rubin was immediately forthcoming. Superintendent Pierson decided that in light of both O'Connor's failure to certify that he could return to work and the contents of Rubin's October 25, 1999, letter (which adverted to O'Connor's "severe anxiety"), O'Connor should submit to an independent psychiatric evaluation. In a letter dated December 7, 1999, Pierson instructed O'Connor to schedule an appointment with Dr. Harold Schwartz, a psychiatrist, and enclosed a medical-records release form for O'Connor to sign. The release form would have authorized the recipient to release O'Connor's medical records to Schwartz and to "the Wethersfield Board of Education . . . or any of [its] representatives." It placed no time or subject-matter limitations on the records to be released.
 
 
 9
 O'Connor hired a lawyer, who objected by letter to both the psychiatric examination and the release form. Without signing the release, O'Connor scheduled the examination. On January 4, 2000, Schwartz interviewed O'Connor for approximately two hours. Schwartz told O'Connor that he would need to conduct more interviews, administer psychological tests, and review records from O'Connor's treatment for alcoholism some thirteen years earlier at a facility called Arms Acres. These records included O'Connor's written responses to questions like the following: "How did you learn about sex? Explain"; "Have you ever masturbated?"; "At what age did you begin masturbation?"; "How had you been taught to feel about masturbation? Explain"; "Have you ever had significant problems with sexuality or sexual functioning?" Schwartz asked O'Connor to sign the release form that Superintendent Pierson had sent O'Connor in December.
 
 
 10
 As of January 20, 2000, O'Connor had neither seen Schwartz again nor executed the medical-records release form when the Board's lawyers wrote to him insisting that he do both if he wanted to keep his job. O'Connor responded within the week with letters to the Board from both Dr. Rubin and Dr. Eric Shore, O'Connor's primary-care doctor, attesting that O'Connor was healthy enough to teach. On January 26, O'Connor went to his own psychiatrist, Dr. Les Smith, who wrote a letter much later, on March 20, stating that O'Connor "is not currently disabled by a psychiatric disorder and is able to return to work at this time."
 
 
 11
 O'Connor next sued the Board and its various employees in Connecticut Superior Court on January 28 seeking, under federal and state law, an injunction against being sent to Dr. Schwartz and money damages. That same day, O'Connor's lawyer wrote the Board's attorneys that, in light of the Board's threat to discipline O'Connor for insubordination if he did not see Schwartz, O'Connor had scheduled an appointment with Schwartz and would allow Rubin to speak with Schwartz about O'Connor's cardiac condition. In response, Superintendent Pierson wrote O'Connor insisting that he see Schwartz and sign the release form. She also noted that because of O'Connor's lawsuit challenging the Board's requirement that he see Schwartz, "I have advised Dr. Schwartz not to proceed further with his evaluation until the Superior Court has ruled on your motion for a permanent injunction. You will remain on medial [sic] leave until the issue has been resolved."
 
 
 12
 O'Connor's state-court complaint contained a claim under 42 U.S.C. § 1983 for violation of his constitutional rights. Based on this federal claim, on February 22, 2000, the Board removed the case to the United States District Court for the District of Connecticut (Robert N. Chatigny, Chief Judge) pursuant to 28 U.S.C. § 1441(b).
 
 
 13
 As discovery and briefing on cross-motions for summary judgment proceeded throughout the year 2000, settlement conferences overseen by the district court were fruitless. Meanwhile, on November 1, 2000, Buganski advised O'Connor by letter that O'Connor had been using up sick leave since November 5, 1999, and that his sick pay would run out on November 30, 2000, which it did. On December 4, 2000, the Board's lawyer reiterated to O'Connor that he could not return to work until he saw Dr. Schwartz and signed the medical-records release "with no restrictions on the records to be reviewed and conversely, on the information that [Schwartz] may share with Dr. Pierson."
 
 
 14
 In late February 2001, Magistrate Judge Donna Martinez, upon referral from Judge Chatigny of cross-motions for summary judgment, recommended (1) summary judgment in the defendants' favor on the two procedural due process and the two substantive due process claims that she deemed raised by the complaint, and (2) remanding the state-law claims to the Connecticut Superior Court.
 
 
 15
 On March 29, 2001, Judge Chatigny adopted Judge Martinez's recommendation as to the procedural due process claims, but deferred ruling on the substantive due process claims and declined to decide whether Superintendent Pierson, the only defendant sued in her individual capacity, was entitled to qualified immunity. On September 28, 2001, Judge Chatigny, upon reconsideration, adhered to his earlier ruling, but found that Superintendent Pierson was entitled to qualified immunity, a ruling that O'Connor has not appealed. Because the only claims on appeal are against the Board and its employees in their official capacity, we refer to the defendants collectively as "the Board."
 
 
 16
 Also on September 28, 2001, the parties informed the district court that because Dr. Schwartz was no longer willing to see O'Connor, they agreed that O'Connor would see a new psychiatrist, Dr. Howard Zonana. Between October and December 2001, Zonana examined O'Connor on four occasions, administered psychological tests, and reviewed the records from Arms Acres related to O'Connor's alcoholism treatment. O'Connor never executed the medical-records release that the Board had originally requested and instead released his medical records only to Zonana. On December 26, 2001, Zonana wrote Pierson that O'Connor suffered no "psychiatric disability" that would prevent him from teaching, and on January 28, 2002, O'Connor resumed teaching.
 
 
 17
 Settlement conferences in 2002 came to naught. Meanwhile, the parties litigated a second state suit featuring only state-law claims that O'Connor filed after the district court's first summary judgment ruling. In September 2003, O'Connor received a jury verdict in his favor on his state-law invasion-of-privacy claim.
 
 
 18
 The moribund district court proceedings resumed when, on October 31, 2003, Judge Chatigny granted summary judgment in the Board's favor on the substantive due process claims that had been left undecided in March 2001. On December 16, 2003, the district court entered judgment in the Board's favor on all of O'Connor's federal claims and remanded the case to state court. O'Connor appeals.
 
 II. DISCUSSION
 
 19
 We review de novo the district court's grant of summary judgment to the Board. See Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 639 (2d Cir.2005). Because O'Connor lost below, we construe the evidence and draw all reasonable inferences in his favor. Id. Summary judgment is warranted only if the evidence demonstrates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Judgment as a matter of law is appropriate if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 
 
 20
 Before we proceed to the merits, we must dispose of the Board's argument that we should rule in their favor based on claim preclusion (res judicata) even though it was not raised below. The Board makes the unsupported, and unsupportable, assertion that its claim-preclusion argument goes to subject-matter jurisdiction and we must therefore entertain it. The Board also asserts that it raised claim preclusion "throughout the litigation," but to support this assertion, it primarily cites documents filed in state court.
 
 
 21
 Claim preclusion is an affirmative defense; it does not go to subject-matter jurisdiction. See Rivet v. Regions Bank of La., 522 U.S. 470, 476, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998); see also Fed.R.Civ.P. 8(c). Although the Board correctly notes that mootness goes to federal subject-matter jurisdiction, see Muhammad v. City of N.Y. Dep't of Corr., 126 F.3d 119, 122 (2d Cir.1997), the doctrines of mootness and claim preclusion are distinct, and the Board has not raised any credible claim that O'Connor's case is moot.
 
 
 22
 Because claim preclusion is an affirmative defense, the Board was obligated to raise it in the district court. See Nat'l Market Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 526 (2d Cir.2004). The district court record does not reveal any reference by the Board to its claim-preclusion argument. The Board has provided this court with a copy of a letter addressed to Judge Chatigny dated October 15, 2003, requesting a briefing schedule on the subject, but the district court did not docket the letter. Even if it received the letter, the district court could not have entered judgment based on claim preclusion unless the Board moved for judgment on that basis, which it did not. A motion by the Board raising the claim-preclusion defense when it became available would have preserved the issue for appeal; a letter asking for a briefing schedule, which was not followed up, did not.[1] The Board waived this defense, and we thus proceed to the merits, beginning with O'Connor's procedural due process claims.
 
 A. Procedural due process claims
 
 23
 O'Connor advances two procedural due process claims. He raises both a classic procedural due process claim, arguing that he was deprived of his property without due process, and a so-called stigma-plus claim based on the theory that his liberty interest in his reputation was infringed by the Board.
 
 
 24
 The stigma-plus claim need not detain us long. To succeed on such a claim, O'Connor must prove two things: 1) some action by the Board imposing a tangible and material burden, and 2) utterance of a false statement that damaged his reputation in connection with the burdensome action. Velez v. Levy, 401 F.3d 75, 87 (2d Cir.2005). The magistrate judge concluded that O'Connor had not alleged the utterance of any false statement and that his stigma-plus claim therefore necessarily failed. The district court adopted this reasoning and granted summary judgment on the claim in the Board's favor.
 
 
 25
 O'Connor's cursory argument for reversing the district court on this point cites Brandt v. Board of Cooperative Educational Services, 820 F.2d 41 (2d Cir.1987), for the proposition that in the employment context, the stigmatizing false statement on which a stigma-plus claim is based need not be publicized but need only be placed in an employee's personnel file where it is likely to be disclosed to future employers. Brandt is beside the point because O'Connor does not allege that the Board made any false statement that stigmatized him, either publicly or in materials in his personnel file. Both O'Connor's complaint and his brief on appeal posit that his stigma arose from the Board's actions, not from its statements.[2] In effect, O'Connor has alleged the plus without the stigma, and argues that the plus alone has created the stigma. Even if O'Connor is correct that townsfolk drew negative inferences from his suspension, this is not enough to make out a stigma-plus claim. The district court properly granted summary judgment in the Board's favor on this claim.
 
 
 26
 O'Connor's property-based procedural due process claim is more substantial. To determine whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment, we must first identify the property interest involved. Next, we must determine whether the plaintiff received constitutionally adequate process in the course of the deprivation. See Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 212 (2d Cir.2003).
 
 
 27
 Identifying the relevant property interest is also a two-step process. See Ciambriello v. County of Nassau, 292 F.3d 307, 313 (2d Cir.2002). First, we must determine whether some source of law other than the Constitution, such as a state or federal statute, confers a property right on the plaintiff.
 
 
 28
 Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.
 
 
 29
 Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Once such a property right is found, we must determine whether that property right "constitutes a property interest for purposes of the Fourteenth Amendment." Town of Castle Rock v. Gonzales, 545 U.S. ___, 125 S.Ct. 2796, 2803, 162 L.Ed.2d 658 (2005).
 
 
 30
 No one doubts that O'Connor, as a tenured public-school teacher, has a legitimate claim of entitlement to his position under Connecticut law. See Conn. Gen.Stat. § 10-151(d). And it is well established that the state-law property interest of government employees who may only be discharged for cause, such as tenured teachers, is a constitutionally protected property interest for purposes of the Fourteenth Amendment. See, e.g., Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-42, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); Strong v. Bd. of Educ., 902 F.2d 208, 211 (2d Cir.1990). Thus if O'Connor had been fired, the Constitution would have required the Board to provide him with certain procedural protections.
 
 
 31
 But the Board did not fire O'Connor; it placed him on sick leave, and his sick pay ran out while the suit was ongoing. Because both the degree of deprivation suffered by O'Connor and the procedures available to him to challenge that deprivation differ in the periods before and after his sick pay ran out, our due process analysis requires that we examine each period separately.
 
 
 32
 Before doing so, however, we reject a threshold argument raised by the Board. The Board asserts that we need not assess the nature of O'Connor's property right in his position or what process he was afforded because the Board did not deprive O'Connor of any property right. According to the Board, it "simply left [O'Connor] on sick leave — a status his physician requested — until he agreed to see a psychiatrist of the Board's choosing," and therefore "O'Connor's own actions occasioned the deprivation."
 
 
 33
 The fact that O'Connor initially asked to be put on sick leave is true but irrelevant. Once O'Connor informed the Board on January 26, 2000, that he was healthy enough to return to work and wanted to do so, his sick leave became involuntary.[3] O'Connor's sick leave was not rendered voluntary by his refusal to comply with the conditions that the Board required him to fulfill before returning to work.
 
 
 34
 Moreover, whether the Board was justified in conditioning O'Connor's return to work on his acceding to its demands is a separate question from whether O'Connor was deprived of a property right. If a tenured employee is fired, he is deprived of a property right, even if he cannot recover damages for his firing because he was fired for good cause pursuant to adequate procedures. Similarly, whether O'Connor was deprived of a property right is an entirely separate question from whether that deprivation was proper. We therefore reject the Board's invitation to assume that O'Connor deserved to be on involuntary sick leave and to conclude, based on that assumption, that he was not deprived of a property right. Instead, we will examine the nature of the property rights O'Connor may have possessed, and determine whether he was deprived of those rights without constitutionally adequate process.
 
 
 35
 1. The period after O'Connor's sick leave ran out
 
 
 36
 Once O'Connor's sick leave ran out, he received no salary and was, in effect, suspended without pay. Although the Supreme Court has not decided whether procedural due process protections extend to employee discipline short of termination, see Gilbert v. Homar, 520 U.S. 924, 929, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997), we have done so in the case of a tenured state employee's suspension without pay, see, e.g., Strong, 902 F.2d at 211; Narumanchi v. Bd. of Trustees of the Ct. State Univ., 850 F.2d 70, 72 (2d Cir.1988) (observing that a school's "decision to suspend [the plaintiff] without pay implicated a protected property interest"). Under this circuit's case law, therefore, the Constitution required the Board to provide O'Connor with adequate procedural protections in relation to placing him on unpaid sick leave, which is the equivalent of suspending him without pay.
 
 
 37
 To determine whether O'Connor received the process he was due, we must consider: (1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; (3) the government's interest, including the possible burdens of alternative procedures. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); see also Ciambriello, 292 F.3d at 319-20 (applying Mathews test). While the ultimate conclusion about procedural adequacy under Mathews turns on the full set of pre-and post-deprivation procedures available, courts often analyze pre- and post-deprivation procedures separately. See, e.g., Locurto v. Safir, 264 F.3d 154, 173-74 (2d Cir.2001). Pre-deprivation procedures are evaluated not only in light of the general Mathews inquiry, but also in terms of the specific due process principle mandating that "a deprivation of life, liberty, or property `be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Loudermill, 470 U.S. at 542, 105 S.Ct. 1487 (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).
 
 
 38
 O'Connor conceded in the district court that the grievance procedure outlined in the collective-bargaining agreement (CBA) governing Wethersfield teachers provided constitutionally adequate post-deprivation process to remedy whatever deprivation he suffered once his sick leave ran out.[4] This concession was wise, since CBA-mandated grievance procedures are routinely (though not always) held to provide adequate post-deprivation process. See, e.g., Harhay, 323 F.3d at 213 (finding that CBA procedures, where unchallenged, provided adequate post-deprivation process); Narumanchi, 850 F.2d at 72; Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 102 (1st Cir.2002). But cf. Ciambriello, 292 F.3d at 323 ("[I]f [the plaintiff] was deprived of a property interest, then he was entitled to more due process than the CBA afforded him."); Goetz v. Windsor Cent. Sch. Dist., 698 F.2d 606, 610 (2d Cir.1983).
 
 
 39
 In relation to his being on unpaid sick leave, therefore, O'Connor has only one claim: that he was provided constitutionally inadequate pre-deprivation process. To prevail on this claim he would have to demonstrate that even in light of the post-deprivation procedure he received in the form of the grievance process, the pre-deprivation process he received was so inadequate that it violated the Constitution. See Loudermill, 470 U.S. at 547 n.12, 105 S.Ct. 1487 ("[T]he existence of post-termination procedures is relevant to the necessary scope of pre-termination procedures."). Because he cannot do so in light of the undisputed facts, the district court properly granted summary judgment in the Board's favor on this claim.
 
 
 40
 Pre-deprivation process "need not be elaborate." Id. at 545, 105 S.Ct. 1487. Its primary function is to serve as an "initial check against mistaken decisions . . . ." Id. Because pre-deprivation process serves a limited function, the Constitution mandates only that such process include, at a minimum, notice and the opportunity to respond. Id. at 546, 105 S.Ct. 1487. Although O'Connor disputes whether he was properly notified in the fall of 2000 that he would be placed on sick leave if he did not return to work, by the time his sick leave was about to expire in 2001 he knew both that he was on sick leave and that his sick leave was running out. Further, O'Connor had voiced his objections to being placed on sick leave first through informal communications from his attorney to the Board, and later through his lawsuit. He thus received adequate notice and opportunity to be heard, which is all the pre-deprivation process the Constitution requires under the circumstances.
 
 
 41
 Moreover, the hearing before Superintendent Pierson to which O'Connor argues he was entitled would have been futile. As we stated in Strong when we rejected a similar argument, "The parties were well aware of each other's assertions and further hearing would have amounted to an empty formality." 902 F.2d at 212. Any speculation that Pierson might have changed her mind at a hearing is easily answered by the fact that she stood by her demands in the face of O'Connor's litigation. In sum, because O'Connor received constitutionally sufficient notice and opportunity to be heard in writing, nothing required the Board to also afford him a face-to-face hearing to raise the same objections he had already put forth. See Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 786 (2d Cir.1991).
 
 
 42
 2. The period while O'Connor was receiving sick pay
 
 
 43
 We now turn to the merits of O'Connor's procedural due process claim relative to the period during which he was receiving sick pay. The district court held, in its March 29, 2001, oral ruling, that the CBA-specified grievance procedure provided an adequate post-deprivation remedy for this period as well. In moving for reconsideration, O'Connor argued that he was forced to exhaust his sick leave before grieving his situation and that the grievance procedure was therefore an inadequate remedy for the period before his sick leave ran out. In response to this argument, the district court held, first, that because O'Connor's interest in his sick leave was "a contract benefit that can be recovered through a post-deprivation breach of contract action," he did not merit a pre-deprivation hearing. It further held that even if O'Connor could not, by prevailing in the grievance proceeding, have his sick leave restored, "his property interest [in] his sick leave benefits did not entitle him to more pre-deprivation process than he received."
 
 
 44
 As discussed in the previous section, O'Connor received adequate pre-deprivation process as to the period after his sick leave ran out. It necessarily follows that he received adequate pre-deprivation process for the period during which he was receiving sick pay: because his deprivation while on paid sick leave was less onerous than the deprivation he suffered while suspended without pay, he cannot have been entitled to more procedure while on paid sick leave than while on unpaid leave. There still remains, however, the question whether O'Connor received adequate post-deprivation process for the period while he was on paid sick leave, a question the district court did not address upon the motion for reconsideration.
 
 
 45
 Neither this circuit's nor the Supreme Court's case law resolves definitively whether accumulated sick leave is a property right that deserves due process protection. Compare Martz v. Inc. Village of Valley Stream, 22 F.3d 26, 31 (2d Cir.1994) (holding that the right to payment on an ordinary contract is not a constitutionally protected property right), with Harhay, 323 F.3d at 212, Ciambriello, 292 F.3d at 316-17, Ezekwo, 940 F.2d at 783, and Greenwood v. N.Y. Office of Mental Health, 163 F.3d 119, 123 (2d Cir.1998) (all finding that employees had constitutionally protected property rights in interests other than employment itself). Even if it is, however, we do not think that an employee is "deprived" of his sick leave in any meaningful sense until he suffers a financial loss because of that leave's unavailability. In cash terms, an employee who is on paid sick leave is no different from an employee who is on leave and receiving his normal salary. Yet no court has held that an employee on fully paid leave has been deprived of a property right merely by virtue of being relieved of his job duties. Indeed, such a position would seem to run afoul of Loudermill, which observed that a state employer, wishing to terminate an employee immediately without providing the pre-termination hearing that due process requires, may suspend the employee without pay. 470 U.S. at 544-45, 105 S.Ct. 1487. Further, decisions from two circuits have rejected due process claims that were based on an employee's asserted property interest in doing his job (as opposed to receiving a salary). See Swick v. City of Chicago, 11 F.3d 85, 87 (7th Cir.1993); Hardiman v. Jefferson County Bd. of Educ., 709 F.2d 635, 638 (11th Cir.1983).
 
 
 46
 As long as the employee is receiving a paycheck equivalent to his normal salary, that the employee is drawing down his sick leave is a bookkeeping entry with no pecuniary effect. The entry has no consequence until the employee suffers actual financial harm, which could occur in three ways. First, the employee could stop being paid while on sick leave, as eventually occurred here. As noted in the previous section, however, once that occurs, the employee is suspended without pay and therefore is entitled to procedural due process in relation to his suspension. Second, he could return to full-time employment, need to take time off for illness, and be deprived of his pay during that time off because his sick leave is exhausted. While this would arguably present a procedural due process problem, we are not faced with such a situation here and need not decide it. Finally, if the employee's contract allowed him to cash out accumulated sick leave upon separation from his employer, he would suffer a financial loss in the form of a reduced payout upon separation due to improperly attributed sick leave. Again, we are not faced with such a situation in this case, nor could we be, since the CBA provides that Wethersfield teachers may not cash out their sick-leave benefits.
 
 
 47
 In this case, we do not think that O'Connor was deprived of a property right in any meaningful sense until his sick pay ran out. Once that happened, O'Connor was able to grieve his situation. Because O'Connor did not challenge the Board's assertion below that his sick leave would be fully restored upon a successful grievance, the grievance procedure was an adequate post-deprivation remedy for his loss of sick pay, just as it was for his loss of salary while suspended without pay.[5]
 
 B. Substantive due process claims
 
 48
 We turn now to O'Connor's substantive due process claims. The district court construed O'Connor to have raised two distinct substantive due process claims. It considered O'Connor's arguments to be that the Board (1) violated his right to privacy, a type of liberty interest, and (2) unconstitutionally deprived him of his property interest as a tenured teacher. On appeal, O'Connor has narrowed the point to whether the Board violated his "substantive rights to privacy and to be free from arbitrary governmental action" by requesting access to his medical records.[6]
 
 
 49
 O'Connor's claims center on his argument that the Board violated his privacy rights by insisting that he sign a broad medical-records release form. The Board conditioned O'Connor's return to work on his being examined by Dr. Schwartz and signing a form that would have authorized the recipient to release O'Connor's medical records to Schwartz and to "the Wethersfield Board of Education . . . or any of [its] representatives . . . ." The form placed no time or subject-matter limitations on the records to be released, and the Board insisted that it had the right to review records Schwartz asked for relating to O'Connor's treatment at an alcoholism-rehabilitation facility, Arms Acres, some thirteen years earlier.
 
 
 50
 If the Constitution forbade the Board to require O'Connor to execute the release, then the Board violated his constitutional rights by imposing on him an unconstitutional condition. It is settled law that the government may not, as a general rule, "grant even a gratuitous benefit on condition that the beneficiary relinquish a constitutional right." United States v. Oliveras, 905 F.2d 623, 628 n. 7 (2d Cir.1990) (per curiam) (discussing unconstitutional-conditions doctrine); see also Lingle v. Chevron U.S.A., Inc., 544 U.S. ___, 125 S.Ct. 2074, 2087, 161 L.Ed.2d 876 (2005) (discussing doctrine in relation to Takings Clause claims); Dolan v. City of Tigard, 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (same; referring to "well-settled doctrine of `unconstitutional conditions'"); Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).
 
 
 51
 To determine whether the Board violated O'Connor's constitutional rights by insisting on the release, we first identify the right at stake. It is well established that the individual right to privacy is protected by the Due Process Clause of the Fourteenth Amendment. See Whalen v. Roe, 429 U.S. 589, 598-600 & 598 n. 23, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The privacy right takes two somewhat different forms: the right to personal autonomy (i.e., the right to make certain choices free of unwarranted government interference) and the right to confidentiality (i.e., the right to hold certain information private). See id. at 598-600, 97 S.Ct. 869; Doe v. City of New York, 15 F.3d 264, 267 (2d Cir.1994); Barry v. City of New York, 712 F.2d 1554, 1558-59 (2d Cir.1983). This case involves the latter.
 
 
 52
 Medical information in general, and information about a person's psychiatric health and substance-abuse history in particular, is information of the most intimate kind. In Powell v. Schriver, we held that postoperative transsexuals "possess a constitutional right to maintain medical confidentiality" about their status. 175 F.3d 107, 112 (2d Cir.1999). Similarly, in Doe, we held that "[i]ndividuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition" because, as a more general matter, "the right to confidentiality includes the right to protection regarding information about the state of one's health." 15 F.3d at 267. In light of these precedents, we easily hold that O'Connor had a protected privacy right in the medical records sought by the Board.
 
 
 53
 That O'Connor has a constitutionally protected privacy interest in his records does not, however, mean that he need never disclose them; it means that he need not disclose them unless the Board has a sufficient interest to justify its request. Where a government employer has reason to question whether an employee is medically fit to work, the employer may direct the employee to undergo a medical examination, see Gargiul v. Tompkins, 704 F.2d 661, 668 (2d Cir.1983), overruled on other grounds, Gargiul v. Tompkins, 790 F.2d 265 (2d Cir.1986), and to provide the examining doctor with relevant medical records, see Strong, 902 F.2d at 212-13. In this case, however, the Board asked O'Connor to release records of substance-abuse treatment dating back over thirteen years not only to Dr. Schwartz, but also to the Board itself and its representatives.
 
 
 54
 The Board argues that it was "entitled to independently review [O'Connor's medical records] should it need to take action" based on its psychiatrist's examination of O'Connor. In the district court, the Board asserted that Superintendent Pierson "needed at least to have the ability to review the raw data [i.e., O'Connor's medical records] to verify Dr. Zonana's (or Dr. Schwartz's) conclusion" about O'Connor's medical fitness. But Pierson has a doctoral degree in education, not medicine. She is not qualified to independently assess O'Connor's medical records and "verify" a psychiatrist's conclusion based on those records.
 
 
 55
 Suppose that the Board prevented O'Connor from returning to teaching because it was worried that his heart condition would prevent him from doing his job, and the Board could therefore justifiably have required O'Connor to see a Board-approved cardiologist and to provide his cardiac-care records to that doctor. It can scarcely be argued that the Board would also have been entitled to review those records in order to verify the cardiologist's recommendation. Lay people are not qualified to determine other people's medical fitness, whether physical or mental; that is what independent medical experts are for. If the Board did not trust its expert's judgment enough to rely on his recommendation, the solution was not for the Board to review the medical records, something beyond the Board's competence, but to send the records and O'Connor to a different medical expert.
 
 
 56
 The district court, however, thought that the Board was entitled to see O'Connor's medical records. The district court concluded that our precedents required it to apply intermediate scrutiny to substantive due process claims alleging the violation of privacy rights. Under this level of scrutiny, the district court granted summary judgment in favor of the Board, concluding that "the Board had a legitimate interest in reserving a right to review the file itself in light of any findings and recommendations Dr. Schwartz might make." We disagree.
 
 
 57
 In contrast to the district court, we think that the Board's demand that O'Connor release his medical records to the Board was arbitrary. Because the Board was not competent to independently evaluate those records, requesting them could serve no legitimate purpose. The Board, and the district court, may have been operating from the intuition that because we all make rudimentary assessments of mental competence in our daily lives — when, for example, we doubt a friend or relative's sanity — lay people are somehow qualified to make such assessments in the workplace. But while psychiatry may not be an exact science, see Newman v. Bd. of Educ., 594 F.2d 299, 304 (2d Cir.1979), it is nonetheless a discipline that can be practiced only by professionals.
 
 
 58
 When legislation burdens constitutionally protected privacy rights, we will apply intermediate scrutiny and uphold the statute only if a substantial government interest outweighs the burdened privacy right. See Doe, 15 F.3d at 269-70; Barry, 712 F.2d at 1559-60. The Supreme Court has, however, set the bar higher for challenges to executive action. See County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[C]riteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue."). To prevail when challenging executive action that infringes a protected right, a plaintiff must show not just that the action was literally arbitrary, but that it was "arbitrary in the constitutional sense," Collins v. City of Harker Heights, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Mere irrationality is not enough: "only the most egregious official conduct," conduct that "shocks the conscience," will subject the government to liability for a substantive due process violation based on executive action. County of Sacramento, 523 U.S. at 846, 118 S.Ct. 1708.
 
 
 59
 The shocks-the-conscience test is necessarily imprecise. As the Court explained in County of Sacramento, "the measure of what is conscience-shocking is no calibrated yard stick. . . ." Id. at 847, 118 S.Ct. 1708. Instead, the test "points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." Id. at 848, 118 S.Ct. 1708. Nonetheless, we can glean from County of Sacramento this important principle: whether executive action shocks the conscience depends on the state of mind of the government actor and the context in which the action was taken. Thus, County of Sacramento established that in the context of a high-speed car chase, only if the pursuing police officer acted with a purpose to cause harm would the action shock the conscience and support substantive due process liability. Id. at 854, 118 S.Ct. 1708. On the other hand, "deliberate indifference" can support substantive due process liability in situations where the government owes a special duty of care to those in its charge. Id. at 849-50, 118 S.Ct. 1708. Finally, we know from Daniels v. Williams, 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), that mere negligence will never give rise to a substantive due process violation. See also County of Sacramento, 523 U.S. at 849, 1182. S.Ct. 1708.
 
 
 60
 Applying these principles to this case, we do not believe that whether the Board's actions were conscience-shocking can be decided at the summary judgment stage. The primary issue is the state of mind of the Board and its agent Superintendent Pierson. Under the circumstances, we believe that deliberate indifference by the Board would not support liability; the Board does not owe O'Connor a special duty of care like that owed by the state to prisoners in its custody. But if the Board intended to injure or to spite O'Connor by insisting on a needlessly broad medical release as a condition of his reinstatement, that intent would plainly support liability in light of County of Sacramento.
 
 
 61
 To uphold summary judgment for the Board, we would have to conclude definitively that the Board acted without culpable intent toward O'Connor. We cannot do so, because the evidence supports reasonable inferences, which at this stage must be drawn in O'Connor's favor, that cast doubt on the Board's motives. Superintendent Pierson submitted to the district court an affidavit dated August 25, 2000, that stated:
 
 
 62
 I have no desire to personally review Mr. O'Connor's medical records, and have requested same only to facilitate the independent examination with Dr. Schwartz[.] . . . My sole concern is the education, health and well being of students and staff. I have no interest in viewing raw medical records[.]
 
 
 63
 This statement conflicts directly with the Board's argument, made to this court and below, that the Board and its representatives needed access to O'Connor's medical records so that Pierson could independently verify the psychiatrist's conclusions. Either Pierson's affidavit is false or mistaken, or the Board's argument before this court is. And if Pierson's affidavit is true — if she really had "no interest" in seeing O'Connor's medical records — then why did the Board insist that O'Connor release his records to it?
 
 
 64
 The summary judgment record is insufficient to allow us to determine what motivated the Board's insistence that O'Connor release his medical records to it. If the Board acted out of incompetence or confusion, this would not support substantive due process liability, for "[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." Bishop v. Wood, 426 U.S. 341, 350, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). But if the Board acted out of spite, or to keep O'Connor from teaching by whatever means necessary, then the Board's actions, intended to oppress O'Connor and having burdened his right to privacy, would shock the conscience. We believe that, on the record developed in the district court, the Board's intentions present a question of fact that precludes summary judgment on O'Connor's claim that the Board violated his substantive due process right to privacy.
 
 
 65
 The district court also erred in granting summary judgment in the Board's favor on O'Connor's claim that his substantive due process right to property was unconstitutionally infringed. This court has recognized that the substantive component of the Fourteenth Amendment's Due Process Clause forbids the government from burdening, in a constitutionally arbitrary way, an individual's property rights. See Zahra v. Town of Southold, 48 F.3d 674, 680 (2d Cir.1995); Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995); see also Lingle, 544 U.S. ___, 125 S.Ct. at 2084, 161 L.Ed.2d 876 (discussing possibility that government action impairing a property right could be "so arbitrary as to violate due process"). County of Sacramento did not distinguish between different types of substantive due process claims, so "constitutionally arbitrary" action for purposes of a property-based substantive due process claim is action that shocks the conscience.
 
 
 66
 O'Connor has alleged only one potentially conscience-shocking action by the Board: its insistence that he release his medical records to it. O'Connor's property-based substantive due process claim is thus derivative of his privacy-based claim and must likewise be reinstated. O'Connor's property-based claim cannot arise, however, until he establishes both that the Board's insistence on seeing his medical records was constitutionally arbitrary and that he was deprived of a property right. As we explained in our discussion of O'Connor's procedural due process claims above, he was not deprived of a property right until his accumulated sick leave ran out; his property-based substantive due process claim is therefore limited to that period.
 
 III. CONCLUSION
 
 67
 For the foregoing reasons, the judgment of the district court is AFFIRMED in part and VACATED in part, and the case is REMANDED.
 
 
 
 Notes:
 
 
 *
 The Honorable John R. Gibson, of the Eighth Circuit Court of Appeals, sitting by designation
 
 
 [1]
 We also observe that we have rejected the Board's effort to correct its oversight by means of what purported to be a motion to supplement the record on appeal. What the Board sought was in fact a remand for the opportunity to raise the claim-preclusion defense for the first time in the district court. This Board's failure to raise the defense is not the sort of "error or accident" contemplated by Federal Rule of Appellate Procedure 10(e)(2), which allows for supplementation of the district court record in some circumstances
 
 
 [2]
 The relevant paragraph of O'Connor's complaint alleges that "[a]s a result of being placed on administrative leave and investigated, and being kept out of work, forced to go to the psychiatrist, and being threatened with the loss of his job . . . [O'Connor] has been stigmatized, and his good name, standing in the community, and reputation diminished, which will likely result diminish [sic] future employment." In his brief on appeal, he asserts that he "suffered a loss of reputation and . . . his work status changed tangibly when he was put on sick leave and then left with no income."
 O'Connor does cast doubt, in his brief on appeal, on the truth of allegations contained in a letter from Buganski to O'Connor dated March 29, 1999. But he does not base his stigma-plus claim on the alleged falsehood of those allegations or on the conclusions reached by the Board after investigating the allegations.
 
 
 [3]
 This is not to say that the Board was obligated to allow O'Connor to return to work once he expressed the desire to do so. Involuntary sick leave may very well be justified. Justified or not, however, sick leave is not always and forever voluntary just because it started out that way
 
 
 [4]
 At the hearing on O'Connor's motion for reconsideration of the district court's procedural due process ruling, O'Connor's counsel conceded that if O'Connor prevailed in a grievance proceeding that was then underway, he would be made whole. O'Connor's counsel asserted that only one claim would survive in that event: O'Connor's procedural due process claim for the period while he was on sick leave and (by hypothesis) unable to grieve his placement on sick leave
 
 
 [5]
 This is not to say that a suspended teacher may never challenge his placement on involuntary sick leave until his sick pay runs out. In particular, if a tenured employee who has been placed on involuntary sick leave (or otherwise suspended with pay) can make out a claim of constructive discharge, then he may have the same right to bring a procedural due process claim that he would have if he were firedSee Parrett v. City of Connersville, 737 F.2d 690, 694 (7th Cir.1984).
 
 
 [6]
 There is, of course, no substantive constitutional right to be free from arbitrary government action as such, notwithstanding the language in some case lawSee, e.g., Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government."). The right, to the extent it exists, is the right to be free of arbitrary government action that infringes a protected right. Thus if the government capriciously gives you a goat (capra hircus), you cannot complain of the gift in federal court. On the other hand, if the government arbitrarily gives you a very needy goat and demands that you take care of it, this may infringe both your property and liberty rights. See Picturesque Expressions: A Thematic Dictionary § 40.6 (Laurence Urdang et al. eds.) (2d ed.1985) (explaining the phrase "white elephant": "This expression probably alludes to the albino elephants which were once considered sacred in Siam (now Thailand). Since an elephant of any color is inconvenient and expensive to own, it was purportedly a custom for a king to bestow one of these unique white elephants as a gift upon a courtier or other person whom he wished to subject to financial ruin.").